182 P.2d 421

**STATE ex rel. STATE GAME COMMISSION v. RED RIVER VALLEY CO.**

No. 4847.

Supreme Court of New Mexico.

Sept. 24, 1945.

Rehearing Denied March 26, 1946.

Second Motion for Rehearing Denied June 18, 1947.

208

C. C. McCulloh, Atty. Gen., and Harry L. Bigbee, Asst. Atty. Gen., for appellant.

Seth & Montgomery, of Santa Fe, for appellees.

Francis C. Wilson, of Santa Fe, Edwin C. Crampton, of Raton, Simms, Modrall & Seymour and Iden & Johnston, all of Albuquerque, Gilbert & Gilbert, of Santa Fe, and Robert J. Nordhaus, of Albuquerque, amici curiae.

MABRY, Chief Justice.

Appellant brought suit for a declaratory judgment against appellee, a corporation, to determine whether or not it could open to the public for fishing and general recreational use that portion of the Conchas Dam reservoir which has been and now is closed to the public use for such purposes.

The lower court held that various contracts which had been entered into by the State of New Mexico, the United States, and The Red River Valley Company precluded the State Game Commission from being able to legally allow the public to go upon the disputed portion of the lake and participate in fishing or any other recreational activities. The lower court further held that the waters involved were not navigable waters, but did hold that they were, in a limited sense, public waters, and therefore not private waters.

The State appealed from this decision on the primary basis that the waters involved are public waters and therefore the public would, when authorized by the State Game Commission, have the right to use such waters for fishing and general recreational purposes; and that they are also navigable waters (an additional method of determining them to be public waters) and that the various contracts involved and hereinafter to be noticed do not deprive the State Game Commission of its power to allow members of the public to make such recreational use. The State is the riparian owner of a portion of the lake area, and public fishing and recreational privileges are enjoyed as to this limited area, and in an additional area wherein the right to use for recreational purposes was specifically given by appellee; and said areas could afford access to all the water without touching appellee's lands; but it does not own any of the land area where the right to fish and boat is now in question.

The suit thus presents the question of the right of the public, when properly authorized by the State Game Commission, to participate in fishing and other recreational activities in the waters in question. The trial court held that the waters of the reservoir were "public waters" only in the sense that they were available for appropriation for irrigation, or like beneficial uses, apparently, and that appellee company had never parted with the fishing and recreational rights on the area of the reservoir involved in this proceeding.

In the year of 1936 the United States, acting through the Army Engineers of the War Department, constructed the Conchas Dam across the South Canadian River, just below its confluence with the Conchas River; and, by means of said dam, created what is known as the Conchas Reservoir, flooding areas in the valleys of both the South Canadian and Conchas Rivers.

Prior to the construction of this dam, appellee was the owner of the Pablo Montoya Grant, confirmed to its predecessors in title by act of congress in the year 1869, embracing some six hundred and fifty-five thousand acres of land in eastern San Miguel County, including the land occupied by the aforesaid dam, and all of the area flooded by the aforesaid reservoir and involved in this suit, including the beds of the Conchas and Canadian Rivers, lying within the exterior boundaries of the grant, except that small portion of the flooded area in the valley of the Canadian River and the Conchas tributary extending outside the boundaries of the grant. Appellee still is the owner of all the said lands within the Pablo Montoya Grant, except as it may have parted with its title by reason of the instruments hereinafter to be referred to. Prior to the construction of the dam, both the Canadian and its tributary, the Conchas River, were perennial streams or rivers, and, according to the court's finding, non-navigable.

On November 13, 1935, in order to facilitate the construction of the dam, appellee entered into an agreement with the Governor of the State of New Mexico, and members of the Interstate Stream Commission of the state, as trustees for the state, whereby appellee agreed to convey to such trustees a certain area in fee simple as the actual site of the proposed Conchas Dam, thereafter constructed, and also an easement to flood and impound water above the dam on a large tract of land owned by appellee. It was made a condition of such contract that the appellee reserved the right "to use the areas affected by this indenture for all purposes not inconsistent with the prior rights of the grantees." This agreement expressly contemplated that all rights so acquired would be at once transferred to the United States, which was done.

On May 8, 1936, appellee executed a further conveyance to the members of the Interstate Stream Commission of the State of New Mexico, as trustees, conveying the right, privilege, power and easement to overflow on account of the construction, maintenance, and operation of the Conchas Dam on the South Canadian River, and to flood and impound water on, and to take and use construction materials from a large area of land, being the same lands as those described in the contract of November 13, 1935. This deed further provided that the easement granted by it is subject to the following reservations and conditions: "Two. The grantor, its successors and assigns, at all times shall have the right to use the area affected by said easement for all purposes not inconsistent with the prior rights of the grantees." The area of the Conchas Reservoir involved

in this appeal is included within the area on which the aforesaid easement is granted.

By conveyance, dated May 13, 1936, members of the Interstate Stream Commission, as trustees, conveyed to the United States all rights acquired by the aforesaid conveyance of appellee, dated May 8, 1936, and this conveyance of May 13th was identical with appellee's conveyance of May 8, 1936, so far as the conditions of said conveyance and the rights reserved to defendant are concerned, appellee's conveyance dated May 8, 1936, and the trustee's conveyance to the United States, dated May 13, 1936, being delivered simultaneously. Pursuant to the aforesaid conveyances, the Conchas Dam was constructed by the Army Engineers of the United States.

About the first of January, 1940, the opening of a part of the Conchas Reservoir to fishing and other recreational uses, and the erection of recreational facilities on the banks of said reservoir, were the subject of conferences with the War Department and state officials. And, on January 25, 1940, appellee conveyed to the United States the fee simple title to 640 acres of land situate on the banks of the reservoir, and in the same conveyance conveyed to the United States "the right to use for fishing, boating, bathing, and any other recreational purposes, a limited water area of the Conchas Reservoir within the exterior boundaries of the Pablo Montoya Grant, except that portion thereof lying in the valley of the South Canadian River

north of a line" described in said conveyance; and this omitted portion is alone involved in this suit. This conveyance of January 25, 1940 was made subject to the reservations and conditions attached to the grant of flowage easement by the deeds of May 8 and May 13, 1936.

Subsequent to appellee's deed of January 25, 1940 and on May 1, 1940, Congress enacted Public Law No. 504, 76th Congress, 54 Stat. 176, authorizing the Secretary of War to grant to the State of New Mexico for public recreational purposes, an easement for the use and occupation of such lands and water areas so owned or controlled by the United States in connection with the Conchas Dam and Reservoir, as the Secretary of War might deem advisable, and under such terms and conditions as he deemed advisable. Apparently pursuant to said Act of Congress, there has been prepared an easement deed, authorizing the State of New Mexico to use for recreational purposes the area conveyed by appellee to the United States in fee simple by the deed dated January 25, 1940 and also the water area covered by said deed.

This so-called easement deed had not been executed by the Secretary of War at the time of the suit but appellant has entered into possession of the areas described in said deed under a verbal understanding with some subordinate official of the War Department; and the public, under rules and regulations imposed by the state authorities, is now enjoying the recreational and fishing privileges on the

Conchas portion of the lake as though the easement deed had been finally executed. The easement deed from the United States to the State of New Mexico is expressly made subject to the reservations and conditions contained in appellee's deed to trustees, of the date of May 8, 1936, and to the provisions, reservations, and conditions in appellee's deed of January 25, 1940, to the United States, but, by its terms only pertains to a restricted portion of the lake not involved in this action.

The contentions of appellee, supported by the findings and conclusions of the trial court, and as they are challenged by appellant in its assignments of error and argument, may be stated briefly under five points, as follows: (1) Prior to the erection of the Conchas Dam, appellee owned the beds and banks of the South Canadian and Conchas Rivers within the Pablo Montoya Grant and had the exclusive rights of fishing therein; (2) the erection of the dam and the impounding of the waters constituting the Conchas Reservoir did not change the situation then existing under which appellee had the exclusive right to fish in the streams; (3) the conveyances executed by appellee passed only a flowage easement, and it retained its fishing and recreational rights in and on the area embraced in these easements; (4) the ownership by the state of the land under a portion of the reservoir extending outside the boundaries of the Pablo Montoya Grant does not give the public the right to fish over the entire area of the reservoir; (5) the United States acquired exclusive jurisdiction over all the rights conveyed by the appellee, and the state has no rights whatever in the premises except insofar as it may claim under the so-called easement deed, and if it can claim under such instrument, it must take subject to all the provisions thereof.

So far as non-navigable streams are concerned, the common law rule, seemingly without exception, is that the one owning both banks of a stream likewise owns the entire bed thereof, the waters are private waters, and the owner has the exclusive right to fish therein. The same rule is sometimes applied to navigable streams, but it is conceded that the weight of authority is, rather, that the bed and waters of a navigable stream are the property of the public with adjoining land owners having no exclusive right to fish therein. See Kinney on Irrigation and Water Rights, 2d Ed., Vol. 1, p. 605, where it is said:

"In fact, under a strict construction of the common-law rule, the right to fish in, or to hunt on certain waters, in the absence of grants or prescription, is in harmony with the ownership of the soil under those waters; if the title to the soil is in the State, the right to fish or hunt is in the public; but, upon the other hand, if the title to the soil is in the riparian owner, he has this right."

See also 36 C.J.S., Fish, § 4, p. 833; 22 Am.Jur., page 682; 24 Am.Jur., page 378; Millspaugh v. Northern Indiana Public Service Co., 104 Ind.App. 540, 12 N.E.2d

396; Griffith v. Holman, 23 Wash. 347, 63 P. 239, 54 L.R.A. 178, 83 Am.St.Rep. 821; Herrin v. Sutherland, 241 P. 328, 42 A.L.R. 937; Hood v. Murphy, 231 Ala. 408, 165 So. 219; People v. Truckee Lumber Co., 116 Cal. 397, 48 P. 374, 39 L.R.A. 581, 58 Am.St.Rep. 183; Winans v. Willetts, 197 Mich. 512, 163 N.W. 993.

Where there is no separation in ownership of soil and water, "the right to hunt and trap from boats on rivers, lakes, streams, etc., is analogous to the right to take fish from the water. As a general rule, the test as to the public right of fowling, hunting, and trapping is the public or private ownership of the soil beneath the waters." 24 Am.Jur. 378.

As to non-navigable streams, argues appellee, our constitutional provision relating to public waters, Art. 16, Sec. 2, to be hereinafter noticed, affords a basis for the exercise of no further rights on the part of the public to use the waters of such streams for fishing and recreational purposes than is the case in other states where the common law rule controls. And, says appellee, the fact that in this jurisdiction riparian ownership does not determine right to beneficial use of the waters of streams, in the conventional sense and as beneficial use is commonly understood, does not compel a different result. But, contends appellant, the common law rule is not here to be applied to use of *public waters.*

The question of right of use, or trespass upon, the lands of appellee bordering upon the lake area in question is not involved. It is not contended by appellant that such right to use any of the lands of appellee would attend the right to go upon the waters. In fact, appellant disclaims any right, or purpose to so trespass. Access to the waters in question can be had by entry at points on the lake area not owned or controlled by appellee.

If it may be said that the waters in which the right to fish is here in question, are in fact public waters, yet unappropriated, applied to beneficial use by others, it is unimportant whether that is, because these waters may now be considered navigable, or for whatever reason the character of public ownership attaches. If they be public, as distinguished from private, or prior appropriated, waters, the contention of appellant must be sustained, and only in this circumstance may it be.

Unless it may be said that appellee had a vested right in the waters so impounded behind the dam, or could, by contract, control their use, the use of the waters, as distinguished from the land up to and under the bed of the streams, or reservoir, no other questions excepting those touching upon the character of the waters as being public or private, and whether use for boating and fishing constitute "beneficial use," i.e. whether such uses properly appertain to unappropriated public waters, need be noticed. We will therefore first determine whether the waters in question are public waters, and, if so, whether the right to use for such recreational and fishing purposes is one of the beneficial uses which appertains to public waters and.

which cannot, under the circumstances, be reserved as against the state, or the public, as appellee has attempted. Whether the language employed in the document was sufficient to reserve such use even if such reservation could have been made, is another question presented and vigorously argued by appellant. A decision upon such point is not required, however, if it can be said that the waters are public in any event and no exclusive right to use could therefore be retained.

Section 2, Art. 16, of the New Mexico Constitution provides:

"The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right." ·

█ Since appellee's title is derived from a congressional act of confirmation, based upon an early Mexican grant, the New Mexico constitutional declaration above noticed could not of course operate to deprive it of any right which may have vested prior to 1911, the date of the adoption and approval of the constitution. But the Attorney General contends, and correctly, we hold, that this constitutional provision is only "declaratory of prior existing law," always the rule and practice under Spanish and Mexican dominion. See Yeo v. Tweedy, 34 N.M. 611, 286 P. 970; Snow v. Abalos, 18 N.M. 681, 140 P.

1044; and as to this prior existing law, see Las Siete Partidas (C.C.H. 1931), part III, Title XXVIII, Law VI, p. 821; Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W. 2d 441; Grubstake Investment Ass'n v. State, 272 S.W. 527, affirmed 117 Tex. 53, 297 S.W. 202; 6 Texas Law Review, p. 524; 7 Texas Law Review 496; 12 Texas Law Review 490; Clough v. Wing, 2 Ariz. 371, 17 P. 453, 456; Maricopa County Municipal Water Conservation Dist. No. 1 v. Southwestern Cotton Co., 39 Ariz. 65, 4 P. 2d 369.

The doctrine of prior appropriation, based upon the theory that all waters subject to appropriation are *public,* "obtained under Mexican sovereignty, continued after the American acquisition, and * * * the sweeping statute adopting the common law, thirty years later (1876), as the rule of practice and decision, did not result in the adoption of rules inapplicable· to our conditions, circumstances, and necessities, and subversive of rights long since vested and recognized. United States v. [Rio Grande] Dam & Irrigation Co., 9 N.M. 292, 51 P. 674; * * * Albuquerque Land & Cattle [Irrigation Co. v. Gutierrez, 10 N.M. 177, 61 P. 357]; affirmed Gutierres v. [Albuquerque] Land & Irrigation Co., 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588." Yeo v. Tweedy, supra [34 N.M. 611, 286 P. 972].

█ Unless it may be said that riparian rights obtain in New Mexico as such rights relate to these water courses, appellee must yield its claim of right to so reserve as against use by the public, and much of the authority in appellee's able and well rea-

soned brief must be said to be without application. Our courts have more than once spoken clearly upon the subject. Yeo v. Tweedy, supra. And, we are unable to find authority, or justification in reason, to support the claim that the "beneficial use" to which public waters, as defined in this and other jurisdictions, may be put, does not include uses for recreation and fishing.

We have said many times that the Common law doctrine of riparian right was not suited to the region, was never recognized, and did not obtain in this jurisdiction. Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N.M. 177, 61 P. 357. See cases last above cited and Snow v. Abalos, supra. And, the judicial declaration "did not make the law; it only recognized the law as it had been established and applied by the people, and as it had always existed from the first settlement of this portion of the country." Snow v. Abalos, supra [18 N.M. 681, 140 P. 1048]. The Arizona courts have held to the same effect. Clough v. Wing, supra. And the United States government, as reflected by acts of the Congress pertaining to waters on public lands, has always recognized the validity of local customs and decisions in respect to the appropriation of public waters. Gutierrez v. Albuquerque Land & Irrigation Co., 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588. It was said by the United States Supreme Court in Broder v. Natoma Water Co., 1879, 101 U.S. 274, 276, 25 L.Ed. 790:

"It is the established doctrine of this court that rights of miners, who had taken possession of mines and worked and developed them, and the rights of persons who had constructed canals and ditches to be used in mining operations and for purposes of agricultural irrigation, in the region where such artificial use of the water was an absolute necessity, are rights which the government had, by its conduct, recognized and encouraged and was bound to protect, before the passage of the act of 1866. We are of opinion that the section of the act which we have quoted was rather a voluntary recognition of a pre-existing right of possession, constituting a valid claim to its continued use, than the establishment of a new one. This subject has so recently received our attention, and the grounds on which this construction rests are so well set forth in the following cases, that they will be relied on without further argument: Atchison v. Peterson, 20 Wall. 507 [22 L.Ed. 414]; Basey v. Gallagher, 20 Wall. 670 [22 L.Ed. 452]; Forbes v. Gracey, 94 U.S. 762 [24 L.Ed. 313]; Jennison v. Kirk, 98 U.S. 453 [25 L.Ed. 240]."

"Under the civil law of Spain all those owing allegiance to the crown were equally entitled to the right to fish in the public waters of the kingdom. Such rights were denominated res communes, and considered as res omnium, in respect to their use and benefit but in respect to property as res nullius. * * * Under the laws of this state, the public waters and the fish therein are held by the state for the benefit of the people of the state, subject to such regulation of the use thereof as the lawmaking power may

provide. * * *" Ex parte Powell, 70 Fla. 363, 70 So. 392, 396.

"It is quite certain, we think, that the mere fact that the jus privatum, or right of soil, was vested in an individual owner does not necessarily exclude the existence of a jus publicum, or right of fishery in the public." Weston v. Sampson, 8 Cush., Mass., 347, 54 Am.Dec. 764, cited in Moulton v. Libbey, 37 Me. 472, 59 Am.Dec. 57.

"If the title vested in the owner does not necessarily exclude the common right of fishery, that cannot be affected by a title to the soil merely; and the ordinance does not attempt to impart any exclusive right of fishery to such owner." Moulton v. Libbey, supra.

Again we find the Moulton case approving language used by Mr. Justice Thompson, dissenting in Martin v. Waddell's Lessee, 16 Pet. 367, 10 L.Ed. 997, where it is said:

" 'The sovereign power itself, therefore, cannot, consistently with the principles of the law of nature and the constitution of a well ordered society, make a true and absolute grant of the waters of the State divesting all the citizens of a common right. It would be a grievance, which never could be long borne by a free people.' * * * no grant of the sovereign power capable of any other should receive a construction that would destroy or impair any right held in trust for the common benefit of the people.' "

Once we concede that the constitution is merely declaratory of the prior existing law obtaining before New Mexico came under American sovereignty and continuing thereafter, as we have held in the Yeo case, and other cases, and as courts of other states likewise recognize the rule to be, we will have determined that the waters in question are public waters; and we have then narrowed the inquiry to the simple one of whether use for recreation and fishing may be considered as among the uses which usually pertain to public waters. See Siete Partidas, a Spanish Code sanctioned as early as A.D. 1505; Vol. 6 Texas Law Review, p. 524; Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441, 447; Vol. 7 Texas Law Review 496.

Upon the question of the general use and right to fish upon and in the public waters under the laws of the Partidas, we take the following language from Farnham's Water and Water Rights, Vol. 1, p. 662, as quoted in the Diversion Lake Club case, supra:

" 'By the civil law the public use of the banks of a river was part of the law of nations, just as that of the river itself.' Farnham's Water and Water Rights, Vol. 1, p. 662. One of the laws of the Partidas provides: 'And although the banks of rivers are, so far as their ownership is concerned, the property of those whose lands include them, nevertheless, every man has a right to use them, by mooring his vessels to the trees, by repairing his ships and his sails upon them, and by landing his merchandise there; and fishermen have the right to de-

posit their fish and sell them, and dry their nets there, and to use said banks for every other purpose like those which appertain to the calling and the trade by which they live.' Las Siete Partidas (C.C.H. 1931), Part III, Title XXVIII, Law VI, p. 821."

Counsel for appellee would distinguish the Diversion Lake Club case. But we are not persuaded that the distinction which they would draw bears the interpretation contended for.

The opinion holds that such waters, being public, and having been impounded from a navigable stream and which overflow upon private lands are, nevertheless, and remain, public waters, and, being such, the right of the public to fish therein without disturbing the terrain in private ownership cannot be denied.

To quote from the opinion:

"When the irrigation company, plaintiff in error's predecessor in title, constructed the dam across the river, it caused by its voluntary act the flood waters of the river, *public waters,* to spread over the land which it had acquired, submerging and in effect destroying a portion of the river bed, and giving to the *public waters* a new bed. This artificial change in the river and its bed did not affect the public nature of the waters and did not take away the right of the public to use them for fishing." (Emphasis ours.)

To quote further from the **Diversion Lake Club** case:

"In general it is held that all members of the public have a common right of fishing in navigable streams and all other public waters. The rule is thus stated by Kinney: 'The general rule in this country is that the right of hunting and fishing by all members of the public is not confined to tidal waters, but has been extended to all of the *public waters* of the country which, as we have seen, are those waters that are navigable in fact.' Kinney on Irrigation and Water Rights (2d Ed.) vol. 1, p. 606. Farnham says: 'The right of fishing in all waters, the title to which is in the public, belongs to all the people in common.' Farnham's Water and Water Rights, vol. 2, p. 1363. * * *

"But it is said that Texas adopted the common law and with it the rule giving to landowners the exclusive right to fish in all nontidal rivers. As has been shown, the rule has no proper application, because of the absence here of the reason for the rule; * * *. However, even if the reason for the rule is disregarded, still it has not been adopted in Texas, because only so much of the common law of England has been adopted as is not inappropriate to the conditions and circumstances of the people and not in conflict with our Constitution and laws." (Emphasis ours.)

The Texas court there held that it was not necessary to decide, and that it did not decide, "whether the rights of the public to use the banks of streams in this state where they are bordered by grants made under

Spanish or Mexican sovereignty are in any respect different from the rights of the public herein determined. * * * And no opinion is intended to be expressed as to what use may be made in emergency, or in any other circumstance, of the banks of navigable streams by persons engaged in commercial navigation." And here we do not have before us any question of trespass, and it is not contended that trespass would be permissible upon privately owned lands, or is contemplated. Access to this public water can be, and must be, reached without such trespass.

We likewise recognized the applicability of the ancient law of the Indian as well as the Mexican law in regard to the character and uses to which public waters could be put in this territory, in Hagerman Irr. Co. v. McMurray, 16 N.M. 172, 181, 182, 113 P. 823, 824. We there said that "the statute was merely declaratory of the law as it had already been established in this jurisdiction * * *."

To quote further from the opinion as it deals with the doctrine of prior appropriation of public water as this doctrine has been superseded by that of the common law:

"The claim of the appellant that he was entitled, as riparian owner on the Rio Hondo, to have the water, which the appellee was diverting for purposes of irrigation, flow to his land in the channel of the stream is untenable. The doctrine of prior appropriation with application to beneficial use has definitely and wholly superseded the common-law doctrine of riparian rights in many of the jurisdictions in which irrigation is necessary to the growth of crops, and among them is New Mexico. The 'Colorado doctrine', as it is termed, first appears as a dictum in Coffin v. Left Hand Ditch Co., 1882, 6 Colo. 443. It declared that, on the ground of imperative necessity, no settler can claim any right aside from appropriation. The decisions of our courts, which had established that doctrine long before it was adopted by statute, have been approved by repeated decisions of the Supreme Court of the United States. Wiel's Water Rights in the Western States, §§ 23, 24, and cases cited; Keeney et al. v. Carillo, 1883, 2 N.M. 480, 492. * * * Indeed, riparian ownership, as known to the common law, has never, it would seem, been recognized in New Mexico. As pointed out in Gutierres v. Albuquerque Land & Irrigation Co., 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588, by the Mexican law in force here at the time the United States acquired the territory, the use of the water of the streams was not limited to riparian lands, but extended to others, subject to regulation and control by the public authorities. And the Mexican law, as well as the law of Indian tillers of the soil, who preceded the Spaniards here, as it may be gathered from the ruins of their irrigation systems, did but recognize the law of things as they are, declaring that such must of necessity be the use of the waters of streams in this arid region."

Navigability, perhaps the earliest test by which the public character of water was fixed, is not the only test to be applied. We do not pause to detail the historical incidents of growing navigation, inland commerce, fishery, and recreation, etc. from which has developed our present law of public waters. At one time, public waters were thought of only as they afforded rights of navigation to the height of tide water; later they were extended to include all clearly navigable streams, and later still, to streams which would be used, not for boats of commerce, but only for the floating of logs and other items of commerce; and, later has come the recreational use where the strict test of navigability earlier applied is less rigidly adhered to. See the following cases and authority on the right of fishery and public waters generally. Nekoosa-Edwards Paper Co. v. Railroad Commission, 201 Wis. 40, 228 N.W. 144, 229 N.W. 631, affirmed 283 U.S. 787, 51 S.Ct. 352, 75 L.Ed. 1415; Lamphrey v. State, 52 Minn. 181, 53 N.W. 1139, 18 L.R.A. 670, 38 Am.St.Rep. 541; People v. Horling, 137 Mich. 406, 100 N.W. 691; 22 Am.Jur. "Fish and Fisheries", Secs. 8 and 9; Dissenting opinion in Hartman v. Tresise, infra.

Even under the general rule, resting upon the Common law, not here controlling, but which would, likewise, support appellant's position when we can say these are public waters, uses of public water are not to be confined to the conventional ones first known and enjoyed. And,

the power of reasonable regulation rests in the state so that not only navigation may be "free to the public" but as well "such other uses as usually pertain to public waters. * * * In fact, navigable waters, in contrast with non-navigable waters, is but one way of expressing the idea of public waters, in contrast with private waters." Nekoosa Edwards Paper Co. v. Railroad Commission, supra [201 Wis. 40, 228 N.W. 147.]

But, we need not here be concerned with the tests required in many of the decisions, the test of navigability. All of our unappropriated waters from "every natural stream, perennial or torrential, within the state of New Mexico" Art. 16, Sec. 2, Const., are public waters. These waters belong to the public until beneficially appropriated. And, since the right to fish in *public waters,* by the test of any rule, is universally recognized it cannot be said that the right to fish and to use these unappropriated public waters in question is less secure in the public because we determine their character as public by immemorial custom, and Spanish or Mexican law which we have adopted and follow in this respect, and under which appellee's predecessors in title to the Pablo Montoya Grant necessarily took.

The case of Hartman v. Tresise, 36 Colo. 146, 84 P. 685, 687, 4 L.R.A.,N.S., 872, so much relied upon by appellee, if not to be distinguished as a case in which the narrower issue actually presented should have been decided without a holding on the ap-

plication of the rule of riparian ownership as to the right of the public to use the water of a stream, the ownership of the bed of which was private, is contrary to what we believe to be the better reason and the great weight of authority. It is to be noticed that in this case there was a special concurring opinion which refused to go along with what was said about the common law of fishery being applicable in Colorado, contending that the simple question of trespass upon enclosed lands was the issue, and upon that issue only need a decision be reached. And, moreover, there is a strong and able dissenting opinion by two members of the court supporting the view we here favor and expressly holding the common law cases which do not recognize separation in ownership as to soil and water to be inapplicable, and showing the general expansion of the public water doctrine. And, as indicative of the doubt which the majority itself might have entertained, we find the opinion placing substantial, if not final, reliance upon the single issue of trespass, where it is said:

"But, if he does, he certainly has no easement over any portion of plaintiff's property, either in the beds of the streams or the adjacent soil, for the purpose of reaching the streams. In the enjoyment of his private property plaintiff is protected, both by federal law and the state Constitution, against encroachment by defendant."

Trespass upon the private land was the issue and the majority, it seems to us, need not have ventured so far afield in its effort to bring support to the holding that such trespass was unlawful. It is important that we read this early Colorado case, the principal one upon which appellee relies, restrained by a clear understanding that it was decided by a divided court, upon an issue much more restricted than the one here involved, and in the light, obviously, of an entire misconception of the true nature of public waters as inherited by us from the early, and continued, Spanish and Mexican law and custom. No notice whatever is taken by the majority in that case of this controlling rule of public water.

But, to quote from the dissenting opinion in the Hartman case, supra, by Bailey and Steele, JJ.:

"It is well settled in this country, as well as in England, that where the title to the bed of a river is in one owner and the title to the water is in another, the right of fishery follows the title to the water. Washburn on Eas. & Serv. 566; Jackson v. Halstead, 5 Cow., N.Y., 216; Halford v. Bailey, 8 Q.B. 1000; Malcombson v. O'Dea, 10 H.L. Cases 593; Lee v. Mallard, 116 Ga. 18, 42 S.E. 372. While we have not gone to great length in reviewing the many cases bearing upon the right of fishery, a careful study of them will demonstrate two things; that where the land belongs to one party and the water to another, the right of fishery follows the ownership of the water; * * *."

So, if waters flowing in these two perennial streams, the rios Canadian

and Conchas, can be said to be public water prior to the construction of the dam, they are no less so after the construction and when a large volume of water from the two streams has been so artificially impounded. Diversion Lake Club case, supra. There must be a diversion and application to beneficial use to constitute an appropriation. And, it cannot be said that these waters have already been appropriated because so impounded, if that would make a difference in the present circumstance. If they had been appropriated by others than itself, then, clearly, appellee would in any event, have no standing to deny appellant's claim to right of use. These waters are not appropriated until application to use has been effected. Millheiser v. Long, 10 N.M. 99, 61 P. 111; Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N.M. 177, 61 P. 357; Snow v. Abalos, 18 N.M. 681, 140 P. 1044; Carlsbad Irrigation Dist. v. Ford, 46 N.M. 335, 128 P.2d 1047.

Behind the dam will rest, normally, some 600,000 acre feet of water. Some of this is designed for irrigation below the structure, some 100,000 acre feet is classified as dead storage, and some is impounded for flood control, to be released as waste water as the occasion demands. It is all yet public water until it is beneficially applied to the purposes for which its presence affords a potential use; and as to some of it, as we have said, it is not contemplated that application to beneficial use in New Mexico is to be made at all. "The water in the public stream belongs to the public. The appropriator does not acquire a right to specific water flowing in the stream, but only the right to take therefrom a given quantity of water, for a specified purpose." Snow v. Abalos, 18 N.M. 681, 693, 140 P. 1044.

If the rule contended for by appellee were to obtain we could enjoy no fishing or recreational rights upon much of the public water of this state, although access thereto could be reached without trespass on the privately owned lands of another.

This is not to say that the courts may go back of the congressional act of confirmation and employ Spanish or Mexican law in force at the time to qualify or limit the title to the land which passes to a grantee by the act confirming and patent. H. N. D. Land Co. v. Suazo, 44 N.M. 547, 105 P.2d 744. But we are here dealing with public waters which are constantly flowing through and upon this as upon other privately owned land the title to the fee in which may be as finally and fully established. We must not confuse title to the land with that to water, certainly not to water which was not upon the land when the grant was made or when the confirmation by the Congress was effected; these are waters which have no relation to the land as it is affected by title to the latter. They are waters, which, for the most part, have their source on lands of others, or public lands far away, and are certainly waters "of" a "natural stream, perennial or torrential, within the state of New Mexico." Art. 16, Sec. 2, Const.

It accords with justice and common sense to say that when the United States in 1869 confirmed title to the lands of the grant in question, and when in 1873 it issued its patent thereto, it was not intended that it should, nor did the patent purport to, destroy, or in any manner limit, the right of the general public to enjoy the uses of public waters. Hagerman Irrigation Co. v. McMurray, supra; State v. Tularosa Community Ditch, 19 N.M. 352, 376, 143 P. 207; Diversion Lake Club case, supra.

"The doctrine of the Common Law as to the private ownership of the water of public streams no longer exists in this Territory or the mountain states * * * *and no longer can there be such a thing as private ownership of the water of public streams in this Territory."* (Emphasis ours.) Albuquerque Land & Irrigation Co. v. Gutierrez, 10 N.M. 177, 61 P. 357.

There is no room here left for the operation of the common law. Riparian rights do not obtain. See Boquillas Land & Cattle Co. v. Curtis, 213 U.S. 339, 29 S.Ct. 493, 53 L.Ed. 822; Yeo v. Tweedy, supra, 34 N.M. at page 616, 617, 286 P. 970.

Nor can we approve the theory that, even though these be public waters, subject to such appropriation, nevertheless, they cannot be *used* by the public until *appropriated* by the public *for* such use. That would be saying that the public must first appropriate its own property, the very waters reserved to it and which have always "belonged" to it, subject, of course, to being specifically appropriated for *private* beneficial use.

Opportunities for enjoying general outside recreation, sports, and fishing, are recognized as one of the outstanding attractions of our state, as indeed they are of many of the states. The invitation to enjoy these activities is urgently and constantly extended by this and other states similarly situated, and millions of dollars are spent by tourists from less attractive areas who have come to enjoy them. "Indeed, courts have recognized, and now more than ever before recognize, the public's interest in pleasure and sports as a measure of public health. * * * While the public right may have originated in the older use or capacity of the waters for navigation, such public right having once accrued, it is not lost by the failure of pecuniary profitable navigation, but resort may be had thereto for *any other public purpose.* * * * The small streams of the state are fishing streams to which the public have a right to resort so long as they do not trespass on the private property along the banks." (Emphasis ours.) Nekoosa-Edwards Paper Co. v. Railroad Comm., 201 Wis. 40, 228 N.W. 144, 147, 229 N.W. 631. And, under the Civil law, as it pertains to public waters, inherited by us from Mexico with the acquisition of the territory in question, fishing rights of the public always appertained to all public waters. Ex parte Powell, 70 Fla. 363, 70 So. 392; Las Siete Partidas, supra. And, the right of public fishery obtains even under the

common law as modified and employed generally in this country, where the ownership of the water is, for any reason, in the public. "Broadly speaking, the rule in this country has been that the right . of fishing in all waters, the title to which is in the public, belongs to all the people in common. Farnham on Waters, § 368a." Herrin v. Sutherland, 74 Mont. 587, 241 P. 328, 331, 42 A.L.R. 937.

See also 1 Farnham on Waters and Water Rights, 605-7, sec. 136. Our construction of public water uses "was an application not only of the former rule which had obtained under the Mexican law, but was the rule which must, of necessity, be applied by settlers of a country where there were no private titles and each one was at liberty to take possession of what he could find unoccupied." 3 Farnham on Waters and Water Rights, p. 2018, sec. 649.

The doctrine which made all such waters public, and available to the general public until in some manner specifically appropriated to beneficial use, and likewise available for specific appropriation to private use under some system of priority of right, perhaps crude enough at first, has obtained in the Southwest, certainly in the area now comprising this state, for some two or three centuries. And, we would not, without the most compelling reason, now hold that any grant emanating either from the Mexican government when it had authority to grant these lands, or by patent from the government of the United States based upon prior confirmation of a perfect, or imperfect, title from the Republic of Mexico, was intended to effect so complete a deprivation of right of public water use as is here proposed.

Although not raised by counsel for either appellant or appellee, our able associates, in dissenting from the majority holding, themselves suggest the point and argue that since under the statute authorizing the issuance of licenses for hunting and fishing, 1941 Comp., Sec. 43-301(9), it is provided no such holder of licenses shall hunt or fish "upon any park or enclosure licensed or posted as provided by law, *or within or upon any privately owned* enclosure without the consent of the owner * * *" (emphasis ours) the legislative intention is thus made clear that hunting and fishing on these public waters is not authorized if such waters be enclosed.

In answer to this argument, all that need be said is that, in the first place, there is no showing whatsoever that these waters in question, covering hundreds of acres in area at, and above, the site of the dam, are enclosed, if, indeed it would be physically possible to enclose them; and, moreover, one does not make of a fenced-in area "a privately owned enclosure" merely by extending the physical markings to cover property not one's own. For example, a public park, a highway, another's land, or the waters which "belong to the public" would not become a part of a "privately owned enclosure" simply because they were enclosed by an adjoining owner. The prop-

erty of the public is not converted into private property by any such simple method. This licensing provision is nothing more than the ordinary regulatory statute for fishing and hunting, exercised under the conventional police power and common to all the states.

In view of this newly injected issue, one neither submitted to the lower court nor in any way relied upon by appellee there, or here, if we were permitted under such circumstances to examine the question at all, we would inquire: How is the minority to overcome the constitutional barrier presented by Art. 4, Sec. 26? This section reads:

"The legislature shall not grant to any corporation or person, any rights, franchises, privileges, immunities or exemptions, which shall not, upon the same terms and under like conditions, inure equally to all persons or corporations; no exclusive right, franchise, privilege or immunity shall be granted by the legislature or any municipality in this state."

Would not this involve the granting of a special "right" or "privilege" contrary to this provision of the Constitution?

As is pointed out by the text writers upon Fish and Fisheries, grants for exclusive fishery may be permitted only in states where the legislature is not faced with such constitutional prohibitions. See 22 Am.Jur. "Fish and Fisheries," pp. 674, 675, Sections 11 and 12, and cases therein cited. The case of Hume v. Rogue River

Packing Co., 51 Or. 237, 83 P. 931, 92 P. 1065, 96 P. 865, 31 L.R.A.,N.S., 396, 131 Am.St.Rep. 732, is a well reasoned case in support of this proposition.

"A construction of a grant which would allow the Crown to destroy or diminish a common right of that nature is to be rejected, unless such intention is so clearly and fully expressed that the grant is incapable of any other reasonable construction. In the same way, assuming the power of a state legislature to grant a several right of fishery, a statute will not be construed to grant a privilege so repugnant to the common rights of the people unless its language clearly required such a construction, and the intent to convey such rights is clearly expressed. In the United States, the right of ownership of the soil and the right of fishing in the waters thereover are not necessarily coextensive. * * *". 22 Am.Jur. 675, sec. 11.

And, even under circumstances where there is no such constitutional restriction against the grant of special rights and privileges, i.e. in the few states where the legislature might constitutionally make such exclusive grant, even then such grants are not "looked upon with favor," and the burden is on the one claiming the exclusive right of fishery to show compliance with the statute. See sec. 11 of 22 Am.Jur., supra; Tinicum Fishing Co. v. Carter, 61 Pa. 21, 100 Am.Dec. 597.

Much of the reasoning supporting the minority's view as expressed by the dissents must rest upon the thoroughly un-

sound idea that the majority holding opens wide the opportunity for trespass upon the lands of all riparian owners, in every class of stream; that with every such perennial or torrential stream carrying unappropriated public waters would go a right to trespass as against the owner over whose lands such water flowed, if that be necessary to reach such public waters. Of course, no such result follows from the majority holding, which deals specifically, and only, with these impounded public waters, easily accessible without trespass upon riparian lands.

 If it were the intention that these waters should have been public only in the sense that they could be diverted from the natural channel through specific appropriation for irrigation, mining, and other beneficial uses, apt language could have been employed in the early, and successive, legislative enactments as well as in the constitutional declaration upon the subject. We find no place for a narrow construction of the language whereby waters are declared "to belong to the public" and to say: "The waters belong to the public only so far as they are subject to diversion from their natural course."

"The water in the public stream *belongs to the public*. The appropriator does not acquire a right to specific water flowing in the stream, but only the right to take therefrom a given quantity of water, for a specified purpose." (Emphasis ours.) Snow v. Abalos, supra.

We are asked to strike down the long established rules pertaining to public water ownership and uses because we have not yet been called upon to apply it to this particular beneficial use. "If the same principles justify * * *," we said in Yeo v. Tweedy in applying the Mexican, or Civil law as distinguished from that of the Common law, to subterranean waters, "it does not matter that earlier occasion has not arisen to apply them."

It may be said that courts have sometimes given a forced construction to laws, or long standing customs, in order to maintain them; but they will not do this in order to destroy them. We know of no reason why we should restrict the use of waters which belong to the public only to the uses which have, up to this time, been adjudicated by our court as "beneficial." See Empire Water & Power Co. v. Cascade Town Co., 8 Cir., 205 F. 123, 128.

 We hold that the waters in question were, and are, public waters; and that appellee has no right of recreation or fishery distinct from the right of the general public. And, no element of estoppel, urged by appellee, is presented by the record. The right of the public, the state, to enjoy the use of the public waters in question cannot be foreclosed by any circumstances relied upon. It cannot be said that such fundamental public rights may be forfeited simply by failure of some public official, at some particular time, to recognize that such rights exist and to insist

upon their observance; or, even by his assumption that no such rights exist. We attach no importance to the failure of certain state officials, members of the State Game Commission, to press for recognition of the public right of fishery in the waters in question at the time they were negotiating in respect to this, and to other areas.

All other questions raised become unimportant in view of our holding that the water area in question constitutes public waters of the State of New Mexico and is subject to the jurisdiction of the State Game Commission so far as the uses here involved are concerned.

For the reasons stated the trial court was in error in holding that appellee was entitled to enforce the restrictions complained of, it having no such exclusive privilege to the use of the public waters as claimed. The judgment is therefore reversed with direction to enter judgment for appellant, all in conformity with this opinion; and it is so ordered.

BRICE and LUJAN, JJ., concur.

BICKLEY, Justice (dissenting).

According to plaintiff's complaint and the defensive pleadings, this law suit started out seeking a declaratory judgment "to have the various contracts herein involved construed in order to prevent any possible violation of any of the provisions of such instruments."

Briefly, the effect of such instruments and the circumstances surrounding their execution, delivery and acceptance, as drawn from the court's findings of fact, was that the plaintiff and its predecessors in interest acquired the right to construct a Reservoir and the fee simple title to 640 acres of land on the banks of the Reservoir, and in the same conveyance "the right to use for fishing, boating, bathing and any other recreational purposes, the water area of the Conchas Reservoir within the exterior boundaries of the Pablo Montoya Grant, except that portion thereof lying in the valley of the south Canadian River north of a line" described in said conveyance.

This conveyance of January 25, 1940 was expressly made subject to the reservations and conditions attached to the grant of flowage easement contained in other deeds and was on the express condition that the area would be adequately patrolled so as to insure protection to private property.

The findings of the court relative to these contracts and conveyances and the circumstances of their execution are thus correctly summarized in appellee's brief as follows:

"At the time of the execution of the deed of January 25th, 1940, it was understood that certain recreational facilities would be erected by the Civilian Conservation Corps of the United States on the area conveyed to the United States in fee simple by Appellee, and that this area, together with the

water area conveyed by said deed of January 25th, 1940, would be turned over to the State of New Mexico for its operation (Tr. 78).

"At the various conferences leading up to the execution by Appellee of the deed dated January 25th, 1940, it was pointed out that Defendant was engaged in the breeding and raising of cattle on its lands adjoining the Conchas Reservoir on both sides; that this Reservoir extended for many miles on lands of Appellee, and that if the entire area of the Conchas Reservoir was opened to the public, Appellee would be under heavy expense in protecting its lands against trespass and fire; and as a part of the consideration of the conveyance of January 25th, 1940, it was agreed that *no part* of the Conchas Reservoir lying in the valley of the South Canadian River, *north* of the line described in Appellee's deed of January 25th, 1940, would be open to the public. Representatives of the State of New Mexico participated in these conferences and were fully aware of all the foregoing matters. (Tr. 78). (Emphasis supplied.)

"Shortly after the execution of the deed of January 25th, 1940 the War Department constructed a boom across the Conchas Reservoir on the line described in Appellee's deed of January 25th, 1940, for the purpose of preventing the public from going above said line, and thereafter, said boom was reconstructed, and has since been maintained by said Game Commission, all of which has been done for the purpose of carrying out the understanding in connection with said deed of January 25th, 1940, (Tr. 78, 79).

"Subsequent to Appellee's deed of January 25th, 1940, and on May 1st, 1940, Congress enacted Public Law No. 504, 76th Congress, authorizing the Secretary of War to grant to the State of New Mexico for public recreational purposes, an easement for the use and occupation of such lands and water areas owned or controlled by the United States in connection with the Conchas Dam and Reservoir, as the Secretary of War might deem advisable, and under such terms and conditions as he deemed advisable.

"Apparently pursuant to said Act of Congress, there has been prepared an easement deed, authorizing the State of New Mexico to use for recreational purposes the area conveyed by Appellee to the United States in fee simple by the deed dated January 25th, 1940, and also the water area covered by said deed. This so-called easement deed, without its exhibits, is set out in Appellant's More Definite Statement, beginning at Page 36 of the transcript, and appears in full, including its exhibits, as Appellee's Exhibit 3, beginning at page 208 of the transcript.

"This so-called easement deed has never been executed by the Secretary of War (Tr. 80), but Appellant claims that it has entered into possession of the areas described in said deed under a verbal understanding with some subordinate official of the War Department, and that there is incorporated

in such verbal understanding all the provisions set out in said easement deed (Tr. 80).

"Said easement deed is expressly made subject to the reservations and conditions contained in Appellee's deed to Chavez and others, as Trustees, dated May 8th, 1936, and in the conveyance of Chavez and others, as Trustees, to the United States, dated May 13th, 1936, and to the provisions, reservations, and conditions contained in Appellee's deed of January 25th, 1940, to the United States, and by its terms, limits any right of the State to the areas of land and water described in Appellee's deed of January 25th, 1940, and excludes the area involved in this appeal, that is, the area between the Lines A and B on Exhibit A–4 of Plaintiff's complaint."

Among the conclusions of law of the district court are the following:

"That the State, by holding possession subject to the so-called Easement Deed, and to the provisions and conditions contained in the deeds referred to in said Easement Deed, is estopped from claiming any right in that part of the Conchas Reservoir lying north of Line A as shown on Exhibit A–4 to the Complaint.

"That the State is further estopped from claiming any rights in that part of the Conchas Reservoir lying north of Line A on Exhibit A–4 to the Complaint by its participation in the negotiations leading up to the execution of defendant's deed of January 25, 1940, (Exhibit A–3 to the Complaint) and by the knowledge that a part

of the consideration for such deed was that the area north of said Line A would not be opened to the public."

The plaintiff, thus confronted with the court's construction of "the various contracts and conveyances" of the parties to this law suit seems to have been obliged to claim something not set forth in the complaint.

The public authorities having assumed to represent the public for the purpose of making the contracts, and the plaintiff having become the successor in interest under said contracts and conveyances and having assumed to represent the public for the purpose of securing a declaratory judgment as to the meaning of such contracts and conveyances, the plaintiff when it had lost the decision, requested the trial court to conclude as a matter of law as follows:

"No statute or law of the State of New Mexico authorizes any public official or group of public officials to enter into a contract, whether oral or written, whereby the recreational rights of the people of the State of New Mexico in the public waters of the State of New Mexico and/or the rights of the State of New Mexico in its public waters may be conveyed, or the State, or the people of the State of New Mexico prevented from claiming the right to use the public waters for recreational purposes. Therefore, any oral or written contract entered into by and between The Red River Valley Company, or the United States of America, or any other person or party, and any public official or officials of

the State of New Mexico, whether such official or officials purported to act for the State of New Mexico, or in any official capacity, which would purport to convey recreational rights, * * * or purport to estop the State of New Mexico and/or the people of the State of New Mexico from claiming recreational rights on the public waters of the State of New Mexico, is null and void, and no such contract can or did take away any of the rights of the state and/or the people of the state in and to any recreational rights or uses they may otherwise have in the Conchas Reservoir and/or Lake.

"No statute or law of the State of New Mexico authorizes any public official or group of public officials to enter into a contract, whether oral or written, whereby the recreational rights of the people of the State of New Mexico in the public waters of the State of New Mexico and/or the rights of the State of New Mexico in its public waters may be conveyed, or the State, or the people of the State of New Mexico prevented from claiming the right to use the public waters for recreational purposes.

"No state official or officials can convey, release, relinquish, or enter into a contract, or perform any acts which can estop the state from claiming any interest or right of the State of New Mexico and/or the people of the State of New Mexico, except pursuant to authority contained in some specific statute or constitutional provision."

I have deemed it worthwhile to indulge the foregoing quotations because it seems essential to me to inform the reader of the scope of the decision in the foregoing opinion and to show how far afield the argument of the prevailing opinion has gone from the "actual controversy" as it was first submitted.

Since the prevailing opinion does not discuss the matter of estoppel of the public authorities, and touches but lightly, if at all, on the question of construction of the "various contracts and conveyances," I take it that the majority feel that it is appropriate to declare that each individual member of the public has an inherent and uncontrollable right to fish in the "unappropriated waters from 'every natural stream * * * within the state of New Mexico'" without the consent of the owners of the lands through which such streams flow and of the banks and beds of such streams because they say that the fact that such waters "belong to the public" is sufficient answer to the protests of such property owners.

This is the question which the majority have made and answered incorrectly, as I believe.

The importance of this decision to the thousands of owners of lands along the natural streams within the state justifies a full statement of the reasons for an opposing view to the end that property owners, members of the bar, and the legislature may be stimulated to corrective measures

if not satisfied that the majority have correctly declared what the state's policy **is.**

Since the proposed opinion does not assert that the streams were originally navigable, and navigability of the waters impounded is not relied upon for the decision, navigability is out of the case.

It is a well settled rule that the right to fish in certain waters depends upon the ownership of the soil beneath such waters. So far as nonnavigable streams are concerned, the rule is without exception that the landowner owning both banks of the streams owns the bed and has the exclusive right to fish therein.

The following are a few of the statements made by the law writers:

"The right to fish in, or to hunt on certain waters, in the absence of grants or prescription, is in harmony with the ownership of the soil under those waters; if the title to the soil is in the State, the right to fish or hunt is in the public; but, upon the other hand, if the title to the soil is in the riparian owner, he has this right. Kinney on Irrigation and Water Rights (2d Ed.) vol. 1, p. 605."

In 36 C.J.S., Fish, § 4, p. 833, the rule is stated:

"As a general rule the right of fishing in waters on land owned by a private individual is exclusively in such owner, and, where such ownership is established, the right may attach to an arm of the sea, where the tide ebbs and flows. In accordance with this rule, the owners of land on the banks of a nonnavigable stream ordinarily have the exclusive right of fishing opposite their respective lands to the middle of the stream, and, if the lands on both sides of the stream belong to the same person, he has the same exclusive right of fishing in the whole stream, as far as his lands extend along it."

In 22 Am.Jur., page 682, the following appears:

"Each riparian owner along a non-navigable stream, whose title carries to the center of the stream, has the right to an exclusive fishery on his own side, extending to the center of the stream; and so far as he owns the land on both sides of the stream, he has the sole privilege of fishing in that portion of the stream within his lands. A stranger becomes a trespasser in wading along the bed of such stream for the purpose of taking fish; and the fact that he gains entrance to it from a navigable one is immaterial. The fact that a private stream has been stocked by the state has been held to give no one other than riparian proprietors any right to take fish from the water."

Cooley on Torts, 3rd Ed., 673, states:

"The right to take fish in the fresh water streams of the country belongs to the owners of the soil under them, to the exclusion of the public."

Angell on Water Courses, 7th Ed., Sec. 61, states:

"Concommitant with this interest in the soil of the beds of water courses, is an ex-

clusive right of fishery; so that the riparian proprietor, and he alone, is authorized to take fish from any part of the stream included within his territorial limits."

Tiffany on Real Property, 2d Ed., p. 1544, states:

"While the individual members of the public have rights of fishing in waters, the soil below which is the property of the State, except in those cases in which an exclusive right to fish there has been granted by the State legislature or other sovereign authority, they have, as a general rule, no such right in water which covers land belonging to a private individual."

In Holyoke Co. v. Lyman, 15 Wall. 500, 82 U.S. 500, 512, 21 L.Ed. 133, the Supreme Court of the United States said:

"Ownership of the banks and bed of the stream, as before remarked, gives to the proprietor the exclusive right of fishery, opposite his land. * * *

"Undoubtedly each proprietor of the land adjoining such a river or stream has in that State (Massachusetts) a several or exclusive right of fishery in the river immediately before his land, to the middle of the river, and may prevent all others from participating in it, and will have a right of action against any who shall usurp the exercise of it without his consent."

It is not asserted in the prevailing opinion that the bed of the stream does not belong to the defendant. And in fact it is so reluctantly conceded "for the purpose of this case only" as to give promise of a contrary assertion. I think it proper to quote from the opinion given by Mr. A. M. Fernandez, Assistant Attorney General, rendered May 27, 1939 because of the cogency of the argument and the value of the supporting authorities cited, and other values. The question propounded to Mr. Fernandez was as to whether lands within the beds of nonnavigable streams in New Mexico belong to the riparian owners or to the State of New Mexico. The answer, in part, was as follows:

"In Hanlon v. Hobson, 24 Colo. 284, 51 P. 433, 42 L.R.A. 502, a contention that 'by analogy to the doctrine prevailing in Colorado respecting the right of the people to the waters of public streams, and to divert the same, which is contrary to the common law doctrine of riparian ownership, the rule should be that the beds of the streams, as well as the waters, belong to the public,' was rejected.

"And in Johnson v. Johnson, 14 Idaho 561, 95 P. 499, 24 L.R.A.,N.S., 1240, ownership of the bed of nonnavigable as well as navigable streams was recognized, notwithstanding the fact that navigable rivers are reserved as public highways.

"California, like New Mexico, acquired its territory from Mexico together with the law then existing under the republic with respect to ownership of the bed of all streams, and prior appropriation of water. By the adoption of the common law as the rule of practice and decision, however, it was decided in Lux v. Haggin, 10 P. 674,

that the Mexican rule had been abandoned, and the Supreme Court of the United States held that the Federal Government as a riparian owner had title to the river bed in a nonnavigable stream in California on the authority of Lux v. Haggin, saying this case held that the adoption of the common law as the rule of decision in the state operated, at least from the admission of the state to the union, as a transfer to all riparian proprietors of the property of the state, if any she had, in the nonnavigable streams and the soil beneath them. Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 at page 829, Ann. Cas.1913E, 710.

"Of course, California recognizes riparian rights to water and we do not. We say that all unappropriated waters, whether perennial or torrential, are public and subject to appropriation. Article XVI, Section 2, of the Constitution; Section 151-101, 1929 Compilation. But the right to the flow of water is quite distinct from the ownership of the bed of the stream, and there is no reason why the rule as to either could not be displaced without affecting the other. State of Oklahoma v. State of Texas, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771, at page 780. See also Kinney on Irrigation, Vol. 1, Sec. 334. And it is significant that neither in the constitution nor in the statute is anything said about the soil under the water.

"Beals v. Ares, 25 N.M. 459, 185 P. 780, states that 'the effect of the act of adoption of the common law (in New Mexico) may well be described by the application of the language of Lux v. Haggin,' 25 N.M. at page 485, 185 P. at page 787. It then proceeds at page 486 of 25 N.M., at page 788 of 185 P., to state that where there is a statute copied after the civil law, the common law occupied all the field of jurisprudence outside such statute.

"It is my opinion that the doctrine of Lux v. Haggin, as interpreted in State v. Donnelly, supra, is applicable to the question of ownership in the soil of nonnavigable streams, and since the Constitutional provision and statute above cited are limited to the waters only, and that the state does not own the bed of any of our streams, except as riparian owner. I find no authority to the contrary, other than the above statements in Kinney on Irrigation.

"Texas also adopted the common law, but it had a statute placing the ownership of all streams more than thirty feet wide in the state. State v. Grubstake Inv. Ass'n, supra; Manry v. Robison, 56 S.W.2d 438."

The foregoing principles which the majority do not refute are controlling and call for an answer to the question the majority have made contrary to the one they have given. But I think there is so much fallacious reasoning in their opinion that it would be unfortunate if it went unchallenged.

They say that since Sec. 2 of Art. 16 of the constitution declares unappropriated waters of every natural stream within this state to "belong to the public" that means

that each individual member of the public has an uncontrollable right to go upon such waters and fish therein without the consent of the owner of the land through which the stream flows. The error in that assertion is, I think, readily demonstrated.

Sec. 2 of Art. 16 of the constitution says: "The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the State."

Our first concern should be as to the meaning of the words and phrases employed in this Section.

Undoubtedly "belong" may be employed and understood as an expression of ownership.

Also, the word "belongs" is used in the sense that the thing is to be in the power of or at the disposal of the public. See In re Hitchens Estate, 43 Misc. 485, 89 N.Y.S. 472, 476.

We now come to the word "public." Definitions taken from Words and Phrases indicate that there are a variety of meanings to be given to the word "public." Therefore it is important to consider the context and to ascertain the intent of the framers of the Constitution. In Bennetts, Inc., v. Carpenter, 111 Colo. 63, 137 P.2d 780, 781, it was decided: "The word 'public' does not mean everybody all the time but the word must be interpreted in each case according to use and intent."

Also, it is important to keep in mind the subject matter of what is declared to "belong to the public." Unquestionably if the law makers were speaking of highways as public highways, the inference would follow that such public highways are open to common use of all the individuals who may be said in a sense to constitute the public.

In City of Clayton v. Nemours, 237 Mo. App. 167, 164 S.W.2d 935, 936, 940, it was decided: " 'Public' has a dual meaning in that it may be employed to describe the character in which a thing is held, or to denote the use to which the thing is put."

The word "public" is frequently used as synonymous with a state or government. In People v. Powell, 280 Mich. 699, 274 N. W. 372, 373, 111 A.L.R. 721, the word is defined as follows:

" 'Public' [means] of or pertaining to the people; relating to * * * or affecting, a nation, state, or community at large."

Again, in Ex parte Horn, D. C. Wash., 292 F. 455, 457, is the following definition:

" 'Public' " is " 'the whole body politic, or all the citizens of the state' ", and the "public" referred to in Immigration Act, 1917, Sec. 3, 8 U.S.C.A. Sec. 136, excluding aliens likely to become a public charge, means the people, the government of the United States.

In Areal v. Home Owners Loan Corporation, 43 N.Y.S.2d 538, 540, it was said

in effect: "Public" referred to community generally, not to different individual members thereof.

In State ex rel. Louisiana Imp. Co. v. Board of Assessors, 111 La. 982, 36 So. 91, 97, it was decided: "Public property is what belongs to the government—federal, state, or municipal."

In Hartman v. Tresise, 36 Colo. 146, 84 P. 685, 690, 4 L.R.A.,N.S., 872, it was decided: "'Public property' may be defined as that which is dedicated to the public use and over which the state exercises control and dominion."

From a study of this Sec., particularly in view of what was held in Hartman v. Tresise, 84 P. 685, etc., and more especially in view of the holding of the court that the words in the constitution of Colorado providing that, "The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided," did not mean that each individual member of the public had a right to fish in such natural streams, my conclusion is that the language of our constitution which is very similar to that of Colorado, that "belong[s] to the public" means that it belongs to the state and is subject to state control, and is meant to be reserved in trust, for those who shall desire and who may be able to appropriate such water for beneficial use in accordance with the laws of the state.

I turn now to another glance at this Sec. 2 of Art. 16. The section says: "The unappropriated *water of* every natural stream * * * is hereby declared to belong to the public and to be subject to appropriation for beneficial use." (Emphasis supplied.) It does not say that the streams as such are public or belong to the public. This distinction is a substantial one.

In Ballentine's Law Dictionary, what is a private stream and a public stream is sharply defined and contra-distinguished in the following which was taken from Webb v. Board of Commissioners of Neosho County, 124 Kan. 38, 250 P. 966. Ballentine says:

"Private stream—A stream to the bed of which a riparian owner can show title deraigned from the United States or from the state. If he cannot show that the federal or state government has parted with title to the bed, the stream is a public stream and the bed of the stream is public property."

I think that since in New Mexico it is conceded that the beds of nonnavigable, fresh water natural streams contiguous to lands in private ownership belong to the owner of the contiguous lands, the streams which wash such lands *as streams* are private streams even though the waters thereof are public in the sense that they are impressed with a trust in favor of the public awaiting such time as one entitled to do so in accordance with the laws of the state has effectuated an appropriation of the waters of such streams.

The particles of waters in a natural stream, since they are migratory are not the subject of private ownership until they are captured and diverted from the stream and applied to a beneficial use and thus reduced to the exclusive private control of the appropriator. Even then it is *"right to use"* and not ownership.

That "the unappropriated water of every natural stream" is declared to belong to the public does not mean that the stream itself is public.

Until waters of natural streams are appropriated "in accordance with the laws of this state" some one must have the control, custody and possession of such water even though the custody and possession may be for a very short space of time because the water is running down the stream. We know that the public officials charged with the duty of administering the waters of the state cannot have the unappropriated waters of the natural streams in their official custody—at least not in their actual custody. The only custody which the public officials will have of these unappropriated waters is constructive. The actual possession and custody must necessarily be in the various owners of the bed and banks of the stream. The stream of water is joined to the bed of the stream and rests upon it, and so the water of the stream is in the custody of the collective number of the owners of various portions of the bed of the stream up and down its length. This custody is not ownership. The situation is thus stated by Mr. Pomeroy in his book on Riparian Rights at Sec. 9:

"Although, as above stated, the riparian owner has no property in the water itself, but only a usufructory enjoyment of it as it passes through or along his lands, yet it is not to be inferred that his right to have the stream flow in its natural channel, without diminution or alteration, is merely appurtenant to the estate, or conditioned upon his actual application of it to some beneficial use. 'By the common law', say the court in California, 'the right of the riparian proprietor to the flow of the stream is inseparably annexed to the soil, and passes with it, not as an easement or appurtenance, but as part and parcel of it. Use does create the right, and disuse cannot destroy or suspend it.' "

I shall show later on, and to what extent, the doctrine of appropriation has modified that rule.

Support to this view, announced by Mr. Pomeroy, if any is needed, is found in the recent case of Akron Canal & Hydraulic Co. v. Fontaine, 72 Ohio App. 93, 50 N.E. 2d 897, 901, decided May 11, 1943. The court said:

"It is ancient learning that the right to flowing water is incident to the title to land, and that there is no right of property in such water in the sense that it is the subject of exclusive appropriation and dominion. The property interest is usufructuary. And each riparian owner has the right to have the natural flow of the stream

come to his land and to make a reasonable use thereof, subject, however, to a like right of each upper proprietor, and further to an obligation to lower proprietors to permit the water to pass on from his estate unaffected except by such consequences as follow from a reasonable and just use of the water.

 \* \* \* \* \* \*

"The impounding of water by means of a dam on a stream is not a reducing of the water to possession in such a sense as to change its legal character and make it property. The principles have been so well established that it requires no borrowed light to determine that water in a nonnavigable stream, or water from such a stream impounded in a lake by a dam, or water impounded from springs or surface drainage, is an incident to the land which gives to such owners of the land certain rights and privileges *in the use of the* water. If it flows over one's own land it is identified with the realty in such a way as to be a corporeal hereditament, and if the right is to use it as it flows over the land of another it is an incorporeal hereditament. Under either circumstance the right of property is *usufructuary* only. *It is not an ownership in the water* but a right to its flow for the various lawful uses to which it may be subjected. This hereditament is incident to the land and therefore passes with it by conveyance, and, for the same reason, it is not severable from the land, although the rights to the use of such water may be conveyed by a proper instrument. (Emphasis supplied.)

"It follows, therefore, that a grant of the right to impound water is a grant of but one of the several usufructuary rights that the owners of the underlying lands possess; and under no circumstances can it be a grant of *property* in the corpus of the water as a chattel."

The foregoing demonstrates that since there never was any ownership by the owner of the soil of the *corpus* of the water as property, but merely the right of the owner of the bed of the stream to its flow for the various lawful uses to which it may be subjected, (including fishing), all the Constitution, Art. 16, Sec. 2, did was to serve notice that these various lawful uses known to the common law could lawfully be interrupted by another who should "in accordance with the laws of the state" appropriate the water so lawfully used (up to the time of the appropriation) to some beneficial use inconsistent with its former use.

In Millheiser v. Long, 10 N.M. 99, 61 P. 111, 113, is quoted a territorial enactment of 1876 as follows:

"All currents and sources of water, such as springs, rivers, ditches and currents of water flowing from natural sources in the territory of New Mexico, shall be and they are by this act declared free." Comp.Laws 1897, § 52.

This was followed the next year (1877) by an act passed by Congress, 19 Stat. 377, for the sale of desert lands which contains in its first section this proviso:

"Provided, however, that the right to the use of water by the persons so conducting the same on or to any tract of desert land of 640 acres shall depend upon bona fide prior appropriation; and such right shall not exceed the amount of water actually appropriated and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held *free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.*" (Emphasis supplied.) See Millheiser v. Long, supra.

This discriminating use of language by the Congress: "free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights," following so soon after the territorial legislation which was subject to the approval of Congress, I think shows exactly what was meant by the use of the word "free." It did not mean that natural streams as such, or the waters thereof, could be freely used by each individual member of the public in common for any purposes whatever, but meant as the Congress phrased it, "free for the appropriation and use of the public for irrigation," etc. Thus understood, the legislation was one of the stones in the foundation for the law of appropriation as contrasted with the law of riparian rights and did not go further.

Likewise, the language in Sec. 2 of Art. 16 of the constitution that the unappropriated water of every natural stream is declared to belong to the public and to be subject to appropriation for beneficial use in accordance with the laws of this state, means that such waters belong to the public for appropriation for beneficial use in accordance with the laws of the state and nothing more.

The prevailing opinion says:

"So far as non-navigable streams are concerned, the common law rule, seemingly without exception, is that the one owning both banks of a stream likewise owns the entire bed thereof, the waters are private waters, and the owner has exclusive right to fish therein."

That is a correct statement unless the majority mean by "private waters" that the waters belong to the owner of the land. That would be incorrect. Neither Mr. Justice Sadler, in whose dissenting opinion I heartily concur, nor I contend that waters flowing in natural streams at some time or other prior to the adoption of Art. 16, Sec. 2 of the constitution were in private ownership, then their assumption that the constitutional declaration that such waters were public waters loses the force of contrast and reversal of concept sought to be applied.

I will have more to say about the interest which the adjacent land owner has in the *use* of water in natural streams flowing through his land later on.

The majority having repudiated the common law seek to justify their concession by a reliance upon Spanish and Mexican law. They base their decision upon their conception "of the true nature of public waters as inherited by us from the early, and continued, Spanish and Mexican law and custom," and repudiate the common law of waters in toto. This would seem to be the point at which a parting of the ways began, although I do not concede all that the majority claim for the effect of the Spanish and Mexican law. My reading causes me to conclude that the law under Mexican regime was not essentially different from the common law doctrine of riparian rights as modified by the rival doctrine of appropriation. The Texas Supreme Court has held that the riparian doctrine was in force in that jurisdiction even under the Mexican and independent regimes prior to American statehood. Motl v. Boyd, 1926, 116 Tex. 82, 286 S.W. 458, 465. The court quoted in support of its conclusion, Hall's Mexican Law as follows:

" 'Waters which are not nor cannot be private property belong to the public. Such were the waters of the rivers which by themselves or by accession with others follow their course to the sea. These may be navigable or not navigable. If they are navigable, nobody can avail himself of them so as to hinder or embarrass navigation; but if they are not, the owners of the land through which they pass may use the waters thereof for the utility of their farms or their industry,' etc.

"In article 1301 the writer says:

" 'If running water passes between estates of different owners, each one of these can use it for the irrigation of his estate or for any other object, but not the whole of it, but only the part which corresponds to him, because both have equal rights, and the one can consequently oppose the use of it all by the other, or even a part considerably more than his own.' "

Pomeroy on Riparian Rights, says at Sec. 114:

"But, on the contrary, the Mexican law, as it existed at the time of the cession of California, did not confer nor recognize any inherent vested right, enforceable in the courts, *in others than riparian proprietors,* to the use of any portion of the waters of a stream, nor any right, *except* as to those who actually appropriated waters in the manner and on the conditions prescribed by the laws." (Emphasis supplied.)

Therefore, I shall attempt to persuade the reader that the common law which was specifically adopted here in 1876, and which is not in conflict with the Constitution of the United States nor of this territory or state, nor inapplicable to our conditions and circumstances is the controlling law in the case at bar.

The right of fishery in fresh water streams sometimes turns upon the question as to whether the stream is navigable or not, it sometimes being asserted that since no one has the right to fish except in a

place where he has a right to be, it follows in reverse that since navigable streams are public highways, a person traveling such a highway has a right to fish in and upon it although this view is vigorously challenged. The confusion which I find in the expression of views by the majority arises from the fact of their erroneous assumption that since the adoption of the "Colorado doctrine" of appropriation, there is no common law of waters existing in this state. In Crawford v. Hathaway, 67 Neb. 325, 93 N.W. 781, 791, 60 L.R.A. 889, 108 Am.St. Rep. 647, the Supreme Court of Nebraska said:

"The two doctrines are not necessarily so in conflict with each other as that one must give way when the other comes into existence. The common-law rule of riparian rights is underlying and fundamental, and takes precedence of appropriations of water if prior in time. The two doctrines stand side by side. They do not necessarily overthrow each other, but one supplements the other."

I would say there is room for both doctrines but that they cannot both work at the same moment of time if they are in conflict. It might be difficult to resolve the conflicts where an appropriation has been made. But before an appropriation has been made I think that the common law is the only law that can apply. When the appropriation is made the law of appropriation steps in to the extent and only to the extent necessary to make the appropriation fully effective.

We are not concerned in the case at bar with just what the rules are which control appropriations of waters "in accordance with the laws of the state," since no appropriation has been made.

"Unappropriated waters" of streams cannot in the nature of things be completely idle and inert. Until it is appropriated and awaiting the touch of the hand of the appropriator "in accordance with the laws of the state," the laws of nature will operate upon it, through it and upon the land to which it is contiguous and which will inevitably impart fertility to the soil through which it flows and afford its beneficences to man and beast, bird and fish.

Are we to assume that since the law of appropriation has not yet taken hold because there has been no appropriation, that there is no law which will aid society while the water is waiting to be appropriated?

I think not, and I know of no other law than the common law which will fill these nooks and corners until the time comes for the common law to move out to some extent in favor of the law of appropriation. In a government publication entitled "Selected Problems in the Law of Water Rights in the West," at p. 32 is a head note as follows:

"Riparian and Appropriative Rights are Equally Entitled to Protection of Law. While the Doctrines Are in Conflict, Adjustments are Made in Specific Instances by the Courts."

And the text says:

"The common-law riparian right vests at the time the land, of which it is a part, passed to private ownership. The appropriative right vests when the appropriation is made."

These views are supported in the opinion of Mr. Assistant Attorney General Fernandez, quoted supra, and find support also in an opinion of Attorney General Clancy given to State Engineer French August 17, 1916. The material portions of this opinion of Attorney General Clancy are as follows:

"I have had on my desk for several days your letter relative to the protest by J. L. Johnson against the granting of Application No. 973 made by M. H. Waller and Lewis Kennedy to appropriate the flood waters of the Tularosa Creek, together with a copy of the application, the transcript of testimony taken and a map. From what you say in your letter, which is confirmed by the testimony, the protestant's claim is based upon his alleged right to the flood waters of the stream which overflow his land and thereby increases the growth of grass thereon, the land being used for grazing purposes, and that his rights will be injured by the construction of the ditch proposed by the applicants, as it will decrease materially the flow over his land. It seems that the water flows naturally over Johnson's land without any effort on his part, needing no ditches or diversions, although the testimony indicates that in 1898 he did some work by filling up the channel so that the floods would spread over more of his land. Whether that which he then did and the subsequent use of the flood waters can be considered as amounting to an appropriation and application to beneficial use, does not seem entirely clear, but whether so or not, I am of opinion that he has *some rights* which your office will not be justified in disregarding in any action taken on the application No. 973.

"It clearly appears, as you state in your letter, that it is evident that there are flood waters running to waste and the applicants are entitled to appropriate them under our general irrigation system, but I cannot see that it would be proper to permit the construction of any irrigation works by those applicants which would interfere with the use of the flood waters by Johnson to the extent to which he has actually used them, and I think this is equally clear whether it is put upon the ground of prior appropriation on his part or upon his rights as a riparian owner.

"At the common law a riparian owner had the right to the undisturbed flow of a stream upon the banks of which his land lay, and such riparian rights are recognized even in the arid states of the Union, although with *some necessary modifications* on account of the paramount importance of the use of water for irrigation, which is clearly recognized in our legislation and also in Article XVI of the State Constitution. It necessarily follows that riparian rights cannot be said to exist in such a country as New Mexico *to the full extent* of

their recognition and existence at the common law. The riparian owner, however, so far as he has any use for the water flowing in his stream, *must not have that right impaired by appropriations of water made subsequent to his beginning the use of the water so that what he requires will be materially diminished."* (Emphasis supplied.)

I express no opinion as to Attorney General Clancy's interesting conclusion, but I call attention to the fact that an early legislative enactment (January 7, 1852) shows that the legislature recognized the impracticability of attempting to repeal the laws of nature. After declaring that "All rivers and streams of water in this Territory, formerly known as public ditches or acequias, are hereby established and declared to be public ditches or acequias", Comp.L.1884, Sec. 6, they said: "All plants of any description growing on the banks of said ditches, or acequias, shall belong to the owners of the land through which said ditches or acequias run." Sec. 11, Comp. L.1884. Thus, even the appropriator of water was compelled, whether he liked it or not, to surrender such benefits as even *his* water had imparted to the banks of said ditches and acequias as the waters washed them.

This view finds further support in the opinion of the Territorial Supreme Court in Trambley v. Luterman, 6 N.M. 15, 27 P. 312, 315, where it was said:

"When the law declares that a riparian proprietor is entitled to have the water of a stream flow in its natural channel, ubi currere solebat, without diminution or alteration, it does so because its flow imparts fertility to his land, and because water in its pure state is indispensable for domestic uses; but this rule is not applicable to miners and ditch-owners, simply because the conditions upon which it is founded do not exist in their case."

When it is said, as it frequently has been, that the common law of riparian rights has been abrogated by the "Colorado doctrine" or the law of appropriation, what is meant is that so much of the riparian rights doctrine has been abrogated as is necessary to be abrogated in order to make the paramount doctrine of appropriation work successfully. Any residue of the common law of waters which it is not necessary to disturb in order to make the superseding doctrine of appropriation work to the full extent of its scope and implication remains. Let me illustrate: Let us visualize a natural stream, the waters of which have not been appropriated to a beneficial use by artificial means (it must be kept in mind that appropriation means diversion from the stream followed by beneficial use); and settlers have acquired land along the river and erected habitations and acquired livestock. As the water runs along, it adds to the fertility of the soil and provides water for domestic use without any appropriation in a legal sense by the riparian proprietor. These advantages the riparian owner enjoys because nature has planned it that way and because of the contiguity of the soil and water. All riparian owners along the stream possess the same right

with the exception of the natural advantage that the upper riparian proprietor may have in his location. Law, says Cicero, arises out of the nature of things. It is surely in the nature of things that riparian proprietors enjoy and are entitled to enjoy the natural advantages of the contiguity of soil and water. So the matter stands until the Appropriator comes, asserting a right arising under the law of appropriation. The appropriator makes a diversion of the water and applies it to his beneficial use. This may be done upon lands contiguous to the river or upon non-contiguous lands. This beneficial use may be irrigation, power to run a mill, for mining, domestic or other beneficial purposes. But there must be a point of diversion and a diversion of the water. If the appropriator appropriates all of the water of the stream, it is in the nature of things that riparian proprietors *above* the point of diversion will be unaffected as to the natural advantages of conjunction of water and soil because common sense tells us that the laws of nature will continue to operate as before. But below the point of diversion the case is different. Riparian owners below the point of diversion will find their natural benefits and advantages gone as well as the water which is gone. That is the situation which caused concern to Mr. Attorney General Clancy and he expressed the view that even the rights of those below the point of diversion which had arisen merely from the nature of things must be taken into account by the appropriator and those administering the law of appropriation. It is said

that the doctrine of appropriation arises out of necessity. At some times and places the necessity was to have water for mining operations. At other times and places it was the necessity for the raising of crops. That is what gave rise to the "Colorado doctrine" in our jurisdiction.

The prevailing opinion quotes from Hagerman Irrigation Co. v. McMurry, 16 N.M. 172, 181, 182, 113 P. 823, as follows:

"The doctrine of prior appropriation with application to beneficial use has definitely and wholly superseded the common-law doctrine of riparian rights in many of the jurisdictions in which irrigation is necessary to the growth of crops, and among them is New Mexico."

The implication is that the common law was at some time in effect in those jurisdictions; otherwise it could not have been superseded. The quotation employed goes on to say:

"The 'Colorado doctrine,' as it is termed, first appears as a dictum in Coffin v. Left Hand Ditch Co., 1882, 6 Colo. 443. It is declared that, on the ground of imperative necessity, no settler can claim any right aside from appropriation. The decisions of our courts, which had established that doctrine long before it was adopted by statute, have been approved by repeated decisions of the Supreme Court of the United States. * * * Indeed, riparian ownership, as known to the common law, has never, it would seem, been recognized in New Mexico. * * * And the Mexican law, as well as the law of Indian tillers of the

soil, who preceded the Spaniards here, as it may be gathered from the ruins of their irrigation systems, did but recognize the law of things as they are, *declaring that such must, of necessity, be the use of the waters of streams in this arid region.*" (Emphasis supplied.)

It is important to note that what our Court was talking about was the doctrine of prior appropriation known as the Colorado doctrine as applied to *arid regions.*

It must be apparent upon a little reflection that whether fish are to be caught from natural streams by the owners of the soil through which the streams run, and where the fish may be at the time of capture or when they are sought to be captured, is not determined by whether the region where they may be is arid or not.

I have not discovered in any of my reading on this subject, which has been rather extensive, that the rules as to the right of fishery are controlled by the conditions of aridity or humidity.

My argument is that whatever its origin, the appropriation doctrine has been superimposed upon an underlying riparian doctrine and that the basic riparian doctrine has been modified to the extent and only to the extent which is necessary to give full force, application and effect to this superimposed appropriation doctrine. I assert that the presence of fish in the water appropriated for mining, agriculture, industrial, domestic and other beneficial purposes is not essential to the beneficial use of the water appropriated for such purposes. We do not have far to look to find legislative and official support for this view. Sec. 30 of Ch. 85, L. 1912, which was a comprehensive code designed for the protection of game and fish states:

"It shall be the duty of the owner or owners of any canal or ditch into which any portion of the waters of any stream containing game food fish as defined by this Act are diverted for the purpose of irrigation or any other purposes which consumes such waters or any user of such waters so diverted, to construct and maintain at the head of such canal or ditch a paddle wheel or wheels, or other device, as may be directed by the State Warden, which shall be maintained during such portion of each year as such waters are diverted for irrigation or other purposes."

This section along with many other regulatory measures was repealed by Ch. 117, L. 1931 which authorized the Fish and Game Commission to make rules and regulations that it might deem necessary to carry out the purpose of protecting game and fish, and I am advised that experiments are now being conducted by the Game and Fish Department to accomplish the purposes contemplated by the statute last above quoted.

It is familiar law that when any portion of the common law is repealed or abrogated, any such alteration will not be considered effective to a greater extent than the unmistakable import of the language used. 15 C.J.S., Common Law, § 12.

In Goldenberg v. Federal Finance & Credit Co., 150 Md. 298, 133 A. 59, it was decided that a statute repeals common law only to the extent of inconsistency therewith. And in Greene County v. Southern Surety Co., 292 Pa. 304, 141 A. 27, it was decided that it is not to be presumed that the legislature intended to make any innovation upon the common law further than the case absolutely required. Substantially the same thing was decided in Beals v. Ares, 25 N.M. 459, 185 P. 780, 788, where it was said: "In so far as was possible it (common law) operated in conjunction and harmony with the statutes." So, I say that the appropriation doctrine displaces the common law only in so far as it is an innovation upon and inconsistent therewith, and that since it is not essential to the beneficial use of water for any of the historic purposes for which it may be appropriated that fish go with the appropriated water, such fish must remain in the stream and the pursuit and taking thereof is governed by common law principles and by state legislative policy and regulations.

The vital and underlying principle of the riparian rights doctrine is that the riparian proprietor, as an incident to his estate, is entitled to the natural flow of the water of the running streams through his land in their accustomed channels, undiminished and unimpaired in quality. It is this right which the law of appropriation has taken away. The appropriator may change the natural flow of the water into new and artificial channels to non-contiguous lands and diminish the quantity.

The rivalry between the two doctrines does not extend further. The appropriator appropriates water but not the fish that have their habitation in it. The appropriator acquires no ownership in the beds of the stream and the statute provides that if the approriator in effecting his appropriation takes any of the lands of the owner he must acquire it by conveyance upon an agreed basis of compensation or acquire it by eminent domain proceedings. The only thing changed by the appropriation is the right of the owner of the banks and beds of the stream to have the water flow as it has been accustomed to flow, uninterrupted and undiminished.

The majority concede that a reasoning by analogy will not carry the ownership of the beds of the stream out of the owner thereof and into the appropriator of the water, or even into the public, so how they are able through invoking the doctrine of appropriation to transfer the right of fishery which is incident to the ownership of the beds of the stream into the individual members of the public to be exercised without the consent of the owner and contrary to the declared policy of the legislature eludes me entirely.

The relation and privileges of the owner of the beds of the stream, as they pertain to the fish, have not been physically or legally changed in any wise whatsoever by the appropriation at the places along the river at the point of diversion.

So far as precedents illuminating the exact point is concerned, the most valuable

is Hartman v. Tresise, 84 P. 685, 4 L.R.A., N.S., 872.

In that case the Supreme Court of Colorado had the precise question before it which we have here under a constitutional provision substantially the same as Sec. 2 of Art. 16 of our constitution. That court held that the constitution has no application to fishing rights and applied the general rule that the owner of the land under a nonnavigable stream had the exclusive right of fishery therein. The court states:

"As between those claiming a right of the same character, that is, a public right of fishery and a private right of fishery, this doctrine of the common law, being of a general nature, is just as applicable in Colorado as elsewhere. Necessity does not furnish a basis for the right of public fishery upon which, it is said in Yunker v. Nichols, 1 Colo. 551, rests the dominant right of one landowner in this state to build a conduit over the lands of another in order to get water from the stream to irrigate agricultural lands. Of course, as between those claiming either a public or private right of fishery in our natural streams, and those asserting the superior constitutional right of appropriation, the latter, in case of conflict, must prevail. But the rights here in controversy are both of the same character and subject to the common-law rule of decision. Gen.St. 1883, § 197. Plaintiff owns lands bordering on both banks of natural streams. As between him and the defendant, he owns the right of fishery in their waters within his outer boundaries. As between them, plaintiff also owns the beds of the streams. just as much as he owns the adjacent banks or the soil anywhere within his surface lines. It necessarily follows that defendant has no right of fishery within plaintiff's enclosure."

There are several circumstances which give this opinion of the Colorado Supreme Court a peculiarly persuasive value.

The same physical conditions affecting the use of water exist in both Colorado and New Mexico, and in both the common law doctrine concerning the rights of private riparian proprietors is recognized as substantially controlling except as modified by the doctrine of prior appropriation known as the Colorado doctrine.

It has stood for over 40 years undiminished in potency by subsequent court decisions or law making bodies. It had stood for 5 or 6 years before our constitution makers framed the language of Art. 16, Sec. 2 of our constitution. It is to be presumed that our constitution makers. during their labors consulted constitutional provisions of neighboring states dealing with questions and rules of conduct affecting conditions and circumstances similar to those existing here, together with court decisions construing such constitutional provisions. We have here the Colorado doctrine of appropriation as in Colorado and the court in Hartman v. Tresise, supra, found that the adoption and existence of such doctrine did not impinge upon the:

common law principles which control the rights of fishery. Counsel for appellee asserts that the decision has frequently been cited approvingly by many other courts and has not been criticized in any decision of other courts. This statement is not challenged by appellant.

It is not too much to claim that in adopting as a part of our constitution the companion provision of the Colorado constitution touching public waters, we at the same time also adopted the construction that had been given such provision by the Supreme Court of Colorado in the very respect here involved in the case of Hartman v. Tresise, supra, decided only seven years prior to the adoption of our constitution. We need cite no authority in support of the proposition that in adopting a statute or constitutional provision of another state, we adopt the construction previously given it by the highest court of record in such state.

My argument is further emphasized and the Colorado court in the Hartman v. Tresise case, supra, is sustained by the Supreme Court of Alabama in City of Birmingham v. Lake, 1942, 10 So.2d 24, where the court held:

"Statute vesting in state title to all fish in public fresh waters of the state and declaring all waters of the state bounding or flowing through land, title to which is held by more than one person to be public waters, must be limited to *conservation* in keeping with the property rights of riparian owners." (Emphasis supplied.)

In other words they said the waters could be *public* for certain purposes including conservation, and yet this was not inconsistent with the common law right of the owner of the bed of the stream to have the exclusive right of fishing therein. From the opinion I quote the following:

"What of the right of the citizen to fish in Blackburn Lake?

"The Act 'To define the status of fish life in the public fresh waters of Alabama,' &c., Gen. Acts Extra Session 1933, p. 67, Section 1, reads:

" 'The title ownership to all fish in the public fresh waters of the State of Alabama are vested in the State for the purpose of regulating the use and disposition of the same in accordance with the provisions of the laws of this State and regulations based thereon.'

"Section 4 reads in part: 'All waters of this State are hereby declared to be public waters if such waters of any river, creek, lake, brook, bayou, bay, channel, canal, lagoon or other body, traverses, bounds, flows upon or through, or touches lands title to which is held by more than one person, firm or corporation. Any water impounded by the construction of any lock, dam or other devices used for impounding . water, and placed across the channel of any public waters, as defined in this section are hereby declared to be public waters.'

"Blackburn Creek comes within this definition, and has at normal stage sufficient

water to maintain fish, as further provided in the act. The waters are impounded by a dam.

"This statute was construed in Hood v. Murphy, 231 Ala. 408, 165 So. 219. We there held, on ample authority, that the bed of a nonnavigable stream is the property of the riparian owner; that he has the exclusive fishing rights in such stream on his own lands. This is incident to ownership of the land.

"Such ownership cannot be divested and granted to the public by legislative fiat. Legislation to such effect is unconstitutional. See, also, Jones et al. v. Nashville, C. & St. L. Ry., 141 Ala. 388, 37 So. 677. The act above quoted must be construed as limited to purposes of conservation in keeping with the property rights of the owner of the lands."

So, I say it is entirely consistent to construe our constitution as the Colorado Supreme Court in Hartman v. Tresise construed substantially the same language in theirs to mean that the water in natural streams is public only in the sense that it is to be conserved. That is, saved, preserved and protected and dedicated to the use of the public for the purposes mentioned in the same section, to wit, for appropriation to beneficial uses and until they have been so appropriated in accordance with the laws of New Mexico they remain subject to the same common law rights always appertaining to them.

Whatever else may be said and whatever the rights of fishery of our inhabitants are,

it cannot be doubted that such rights are subject to regulation by the legislature and the Game and Fish Department within the exercise of authority properly delegated to it.

1941 Comp. Sec. 43-405 treats of the protection of game and fish on private property and provides that, "After the publication and posting of such notices it shall be unlawful for any person to enter upon said premises or enclosure for the purpose of hunting or fishing, or to kill or injure any birds, animals or fish within such enclosure or pasture at any time without the permission of such owner," and makes the violation of the provisions of the Section a misdemeanor.

And 1941 Comp. Sec. 43-301 provides in the first paragraph thereof:

"No person shall at any time shoot, hunt, kill, injure, or take in any manner, any game animal, game bird or game fish without paying for and having in possession a license as herein provided for the year in which such shooting, hunting, fishing or taking is done."

The second paragraph provides how and to whom hunting and fishing licenses may be issued.

Paragraph 9 of said Sec. provides:

"No hunting or fishing license shall entitle the holder therefor to hunt, kill or take game animals or birds or fish within or upon any park or enclosure licensed or posted as provided by law, *or within or upon any privately owned enclosure with-*

*out consent of the owner* or within or upon any game refuge. (Laws 1912, ch. 85, § 12; Code 1915, § 2435; Laws 1915, ch. 101, § 7, p. 152; 1919, ch. 133, § 3, p. 285; 1927, ch. 34, § 1, p. 43; C.S.1929, § 57-217; Laws 1935, ch. 123, § 1, p. 303.)" (Emphasis supplied.)

Sec. 43-510 provides:

"Any person who shall violate any provision of this act * * * shall be guilty of a misdemeanor."

This is a legislative recognition of the law as contended for by appellee, and furthermore it is a declaration of the policy of the state.

No one can lawfully hunt or fish for game animals or fish without a license. Anyone who accepts a license accepts the terms under which it is granted.

Hence, the real question is, has one desiring to hunt and fish "within or upon a privately owned enclosure without the consent of the owner" a constitutional right to do so notwithstanding the statute and the acceptance of a license issued pursuant thereto? In other words, is the statute constitutional?

The legislature, and not the courts, are the public policy makers for the state.

The public policy proclaimed by 1941 Comp. Sec. 43-301 is that even licensed hunters and fishermen shall not "hunt, kill or take game * * * birds or fish within or upon any park or enclosure licensed or posted as provided by law, *or within or*

*upon any privately* owned enclosure without the consent of the owner."

Until the power of the legislature to proclaim such a public policy is directly attacked, I see no reason to anticipate such an attack and provide answers thereto which, as I feel, would be several fold and substantial.

It is to be noted that the offenses inveighed against in these statutes are not made to hinge on whether the violater committed any actual damage or not. The effect of the majority opinion is to nullify these statutes because it cannot be said to be a misdemeanor for a person to do what the Supreme Court says he has a right to do.

The Department of Game and Fish have published a booklet which is widely distributed advising the public of Game and Fish Laws and Regulations. A copy of this pamphlet before me admonishes: "Posted Property Does Not Furnish Hunting or Fishing," and declares to be among the sportsman's duties: "The first duty of every sportsman is to observe the letter of the law" and also quotes Sec. 43-301(9), heretofore quoted. Here we have a departmental construction that the law is as claimed by appellee. It is my opinion that the public policy of the state manifested by the foregoing acts of the legislature and as heretofore accepted and fostered by the Department of Game and Fish, is the best policy as tending to promote the greatest good to the greatest number, and that none more just and reasonable can be adopted

for this state, and that even if there were a better one it should await the action of the legislature since the courts have no power to make or change public policy.

The experiment proposed and supported with great industry and zeal arises, I believe, from a desire to cater to the tourists who are said, in the language of the street, to be "our best crop". This is reflected in the language of the opinion as follows:

"Opportunities for enjoying general outside recreation, sports, and fishing, are recognized as one of the outstanding attractions of our state, as indeed they are of many of the states. The invitation to enjoy these activities is urgently and constantly extended by this and other states similarly situated, and millions of dollars are spent by tourists from less attractive areas who have come to enjoy them."

That consideration, if it is a sound one, should be addressed to the legislature and not to the courts. There are several objections to this reasoning of the majority. One is that it is not relevant. Another is that it is a sound observation of the law writers that: "It is easy to make precedents but very difficult to anticipate the ramifications of their application." And also, such reasoning is of doubtful value. Cf. 25 Mich.Law Review, 654 (659).

The Court of Errors and Appeals of New Jersey in Albright v. Cortright, 64 N.J.L. 330, 45 A. 634, 637, 48 L.R.A. 616, 81 Am. St.Rep. 504, said:

"It may be true that there is here, as there seems to be in England, a common misapprehension on this subject, and that a good deal of fishing that is thought to be of right is only permissive. But it is not desirable to change an important rule of law merely because it is sometimes misunderstood. In country life a multitude of acts are habitually committed that are technically trespasses. Persons walk, catch fish, pick berries and gather nuts in alieno solo, without strict right. Good natured owners tolerate these practices until they become annoying or injurious, and then put a stop to them. Little practical inconvenience results from this state of things, which the courts may well leave to regulate itself."

The prevailing opinion invites technical trespasses at least, closing eyes to feared actual damage which may follow such trespasses expressed in the plea of defendant and findings of the lower court. These threats of damage the plaintiff seeks to minimize by its allegation of its complaint as follows:

"That upon opening of the portion of the Conchas Dam reservoir to line B as shown on Exhibit A-4 to boating and fishing and other recreational purposes to the general public, the State of New Mexico will place adequate patrols on the shores of the lake in order to prevent any person from touching or allowing their boat to touch any part of the shore, or land on the bottom of the lake and will patrol and adequately con-

trol and supervise all portions of the lake in order to protect private property."

Just how this declaration of the plaintiff of its intention to "place adequate patrols on the shores of the lake" upon defendant's property squares with due process of law is not clear to me, and happily is not developed in the prevailing opinion. The foregoing allegation of the complaint, however, does indicate that the plaintiff anticipates that rights of defendant may be invaded and proposes to commit trespass of its own in order to repel damaging trespasses by members of the public whom it proposes to invite to commit what it appraises as mere technical trespasses.

The majority say that what is proposed to be permitted is not a trespass. This assertion, unsupported by citation of authorities, I may not let go unchallenged. What my learned associates of the majority mean, perhaps, is that in their opinion the trespasses invited will be inconsequential.

To say that in a case where there has been no separation of the land and the water, a going upon the water is not a trespass is of course shocking. And the principle that the land owner owns above and below the surface has been so uniformly asserted by law writers as to require little citation. "It [is] the consensus of the holdings of the courts in this country that the air space, at least near the ground, is almost as inviolable as the soil itself." See Herrin v. Sutherland, 74 Mont. 587, 241 P. 328, 332, 42 A.L.R. 937.

It has always been my understanding that the land owner is entitled to the "quiet, undisturbed, peaceable enjoyment" of the land. This old-fashioned idea finds support in Art. 2, Sec. 4 of our constitution where it is said that all persons have the right "of acquiring, possessing and protecting property."

To say that a trespass is not a trespass because the declarants do not anticipate that evil consequences will arise therefrom is a dangerous departure from principle.

Mr. Street in his work on "Foundations of Legal Liability," Vol. 1, page 19, et seq., shows how jealous the common law is in the protection of the owner of land against trespass. As I gather it, because there is often no other eye than that of the law to guard his lands, the law protects the land owner against trespass even though he is not able to prove a special damage, and if the trespass has been committed the plaintiff land owner suing for trespass will be entitled to nominal damages even though he has not been able to prove any actual damage. This deep concern for the land owner is illustrated by the following quotation from Mr. Street's comments on trespass upon realty heretofore cited:

"Upon comparing the rule in trespass upon realty (trespass quare clausum) with the rule in trespass for assault and battery, we note this distinction: In the field of battery, a touching which does no physical hurt is not actionable unless it be hostile. The person touched in a friendly way is

perhaps supposed to consent to the touching. At any rate there is a legal presumption in favor of the friendly hand. In the field of trespass quare clausum it is different. There the legal presumption is against the intruder, and to escape liability he must nearly always show actual leave to enter. In both fields the state of the law seems to be such as to give the necessary protection respectively to person and property and no more. A man may well be expected to protect himself within certain limits from physical hurt. *But there is often no other eye than that of the law to guard his lands.*

"The reason for the stricter rule in trespass upon realty is apparently found in the fact that upon the action of trespass quare clausum has been largely put the burden of vindicating property right—one of the greatest ends, says Lord Camden, for which man entered into human society. The law unquestionably does not prize property more than it does personal security, but at some points it has had to put forth more energetic efforts to protect property than it has to protect personal security. When it was once determined that a man could resort to a form of trespass to settle a matter of disputed title, the character of the trespass upon realty was fixed. Thenceforth the common law, in considering liability for intrusions upon realty, could not undertake to discriminate between the much and the little. In the language of Littleton, J., 'the law is all one, for great things and for small.'" (Emphasis supplied.)

Furthermore, the guess of the majority that the incursions into the space above the soil owned by the defendant will not be consequential is not shared by the trial court nor by the plaintiff, which has proferred its services to patrol the banks of the streams to minimize or prevent anticipated evil consequences, and it is not shared by our legislature which has inveighed against such incursions as heretofore pointed out.

The reference in the majority opinion to the extension beyond the conventional appropriation of water for beneficial use such as agriculture, mining, etc., are confusing unless the argument is that the practicing fisherman appropriates water to a beneficial use when he goes fishing in the waters of our natural streams.

It may be admitted that fishing is one of the best of the outdoor sports and beneficial to the individual and ultimately to society in general. But if it is claimed that the fisherman pursuing his art is effecting an appropriation of water for a beneficial use "in accordance with the laws of the state" to which the water is "subject," it is more than I can accept. It must be remembered that at the time of the adoption of Art. 16, Sec. 2 of our constitution, which says that the unappropriated water of natural streams is "subject to appropriation for beneficial use, in accordance with the laws of the state," we had a code governing the appropriation of water for beneficial use. Surely no one may reasonably claim that a fisherman appropriates water according to

the provisions of this code. The only law that I know of that might be applicable to the fisherman in aid of his use of water is the code controlling and regulating game and fish which says that the fisherman must have a license before he may fish in our streams and the *same law* says that such a license does not afford fishing on posted lands or in the streams within enclosed lands without the consent of the owner. But the majority in effect say that the legislature had no power to impose these regulations and restrictions. So, the majority view reduces itself to the proposition that, while the appropriation of waters of natural streams for the beneficial purposes of agriculture, mining, power and industrial activities must be "in accordance with the laws of the state," there is no law and none may be enacted "in accordance with" which the fisherman may operate. This result, which is satisfactory to the minds of the majority, rather confirms my view that Sec. 2 of Art. 16 of our constitution has no application at all to the right of fishery as here involved.

From all of the foregoing and after painstaking consideration of the case, I am unable to comprehend any rational justification for the prevailing decision and believe it unjust and dangerous.

Therefore, I dissent.

SADLER, Justice (dissenting).

Another birthright of Anglo-Saxon jurisprudence—the citizen's dominion over his own property—has been stricken down and laid low, not as might have been expected, by the grasping for power of some inordinately ambitious chief executive, nor yet by action of the legislative branch of our government (which contrarily has sought to preserve the right here denied, 1941 Comp. § 43-301(9), but anomalously enough, through error and misapprehension so easily demonstrable as to make the result announced appear incongruous, by the very department—*the judicial*—long since come to be regarded as the last refuge and sanctuary of the rights, the liberties and even the lives of the people!

If one be disposed to think this statement evidences undue alarm over the holding today announced by a bare majority of the court, one has only to realize that it but represents the initial precedent which later will be urged as authority for throwing open to public fishery every perennially flowing stream in the state. The majority do little to allay the fears this decision will instill in the minds of landowners generally throughout the state by asserting that trespass on the banks or in the beds of streams is not involved, that "access to this public water can be, and *must be,* reached without such trespass." (Emphasis mine.) Thus while their opinion gives lip service to the landowner's immunity from such trespass, at the same time it announces a ruling on the issue presented which in its natural and logical implications pulls down the very immunity declared. Protest as they will that the question is not involved, the majority cannot down the obvious fact that it is in-

volved, since a trespass upon these waters as they flow across or rest upon appellee's land, is a trespass upon the land itself.

In spite of the declaration by the majority that their holding does not forecast a subsequent decision upholding the right to use the banks and beds of streams in enjoying this so-called common right of fishery, they can no more destroy the logic of today's contrary holding than they can transmute colors by calling black—white. The holding is that so long as the fisherman may fish without touching the land of another he commits no trespass. It rests fundamentally upon the proposition that such waters are "public." They are no less so when they flow across an owner's land at a depth requiring one to tread upon the land itself in order to enjoy fishery in them. Obviously, the logic and rationale of today's holding is that the fisherman so treading will not be a trespasser. Themselves seemingly sensing the ultimate holding toward which the logic of their opinion leads, and applied would so resolve, the majority's effort to curb and limit its sweeping implications in no way renders it less objectionable nor more consonant with or conformable to sound reason.

If further proof were needed that the foregoing criticism correctly appraises the prevailing opinion in this connection, it is abundantly supplied by the following quotation therefrom with the significant language italicized by me for emphasis, since it is revolutionary in its import and obviously goes beyond the holding thus far of any court, anywhere, which purports to follow and apply the Colorado doctrine of public waters, to-wit:

"The doctrine which made all such waters public, *and available to the general public until in some manner specifically appropriated to beneficial use, and* likewise available for specific appropriation to private use under some system of priority of right, perhaps crude enough at first, has obtained in the Southwest, certainly in the area now comprising this state, for some two or three centuries."

Indeed, the glorification in the prevailing opinion of New Mexico's admitted attractiveness to tourists, especially the fisherman, in which all of us take just pride, the approving quotation from Nekoosa-Edwards Paper Co. v. Railroad Comm., 201 Wis. 40, 228 N.W. 144, 229 N.W. 631: "The small streams of the state are fishing streams to which the public have a right to resort so long as they do not trespass on the private property along the banks," in the knowledge that our small streams are not of a type to which the public may resort without trespassing on the private property of others; the quotations from texts and cases suggestive that the common right of fishery under the civil law confers on the public a right to use the banks of streams and the intimation that our law of public waters is derived from the civil law through Spanish and Mexican sovereignty—these and, in fact, the opinion's ratio decidendi itself—in my judgment, fairly place it on record in bold advocacy of throwing open to

public fishing all streams in New Mexico even though crossing privately owned and enclosed lands.

Much of the confusion in which the majority have become enshrouded in their consideration of this case arises from the effort to treat literally the constitutional declaration that waters in flowing streams "belong to the public." If they belong to the public, then the public owns them and all have a common interest in public property. Thus runs the train of thought. So, from this starting point and weighing the several attributes and incidents of title and ownership of ordinary property, as commonly understood, the follower of this false logic is lead easily and inexorably to the conclusion that where a given thing belongs to the public, a common right in its use and enjoyment exists. Hence, the result announced by the majority.

Now, it is misleading and brings one to false results to speak or conceive of waters as "private" or "public," if by such designations it is intended that waters of the one class are the subject of individual ownership and by the other of public ownership. Water in a running stream, with or without a constitutional declaration that it is "public" is no more capable of ownership, public or private, in the ordinarily understood sense, than is the air we breathe. This is a fact of life requiring but its statement to establish its truth. The prevailing opinion agrees, as all of us know, that our constitutional expression on the subject, Const. Art. 16, § 2, is merely declaratory of what the law already was in this jurisdiction and, as a practical matter, in jurisdictions the world over, as to flowing waters. The rationale is that, being incapable of ownership by anyone owing to their elusive and migratory character, they are the property of none and, hence, belong to all—the public; or, as is sometimes said, what is nobody's is everybody's—the public's. The fee simple owner of real estate is said to own from the center of the earth to the skies— "a coelo usque ad centrum"—but it has never been supposed that this "ownership" as it relates to the air was anything more than a right of control to the height man could exert control. And all that was ever intended by the declaration that certain waters are public, be it found in statute, constitution or decision, is that their use may be controlled and regulated for the benefit of the public. Cf. State v. Cochran, 138 Neb. 163, 292 N.W. 239, 247; United States v. Tilley, 8 Cir. 124 F.2d 850, 860. Hence, to classify waters as "private" or "public," extending to the one an exclusive and to the other a common right of fishery with ownership the test is to apply a false criterion since there is no genuine ownership in either instance. Nevertheless, such a distinction is made the basis of the reasoning of the prevailing opinion throughout. The premise being false, the entire argument founded on it must fail.

Two decisive considerations establish convincingly the error into which the ma-

jority have fallen. In the first place, the common law applies and under it the owner of the soil has an exclusive right of fishery in the waters involved. In the second place, even if correct in the claim that the appellee possesses no exclusive right of fishery in these waters, the state as a police measure, by a statute whose validity has never been challenged, has expressly denied to the licensees on whose behalf appellant presumes to speak, the right to fish within the private enclosure where these waters are resting. 1941 Comp., § 43-301(9). The correctness of either proposition abundantly supports the judgment entered in this case, and both being correct, it is doubly fortified.

Let us notice the first proposition. The prevailing opinion freely admits in its opening passages that under the common law the appellee has an exclusive right of fishery in and upon these waters, although toward its close, as though grasping for every reed of support, however slender, it goes so far as to claim support for its position, even under the common law. Fundamentally, though, and by and large, it asserts the common law has nothing to do with the matter. It argues that the doctrine of riparian rights as known to the common law has been so thoroughly repudiated in this jurisdiction that not the tiniest shred remains. Conceivably so, possibly, but in order to make its argument stand up, the appellant must establish the truth of this claim or it hopelessly and ignominiously fails. Unhappily for it, the argument simply cannot stand the acid test of careful analysis.

In 1876, the territorial legislature enacted: "In all the courts in this territory (state) the common law as recognized in the United States of America, shall be the rule of practice and decision." 1941 Comp., § 19-303. The effect of this statute is set forth by this court in Beals v. Ares, 25 N. M. 459, 185 P. 780, in the following language, to-wit:

"When the Legislature in 1876 adopted the common law as the rule of practice and decision, the whole body of that law as limited in the case of Browning v. Estate of Browning, supra, came into this jurisdiction. Where it found a statute counter to its provisions, it yielded to the statute, but it gave way only in so far as the statute conflicted with its principles. In so far as was possible it operated in conjunction and harmony with the statutes. If the statute conflicted with it, it bided its time, and upon repeal of the statute became again operative. In other words, the common law, upon its adoption, came in and filled every crevice, nook and corner in our jurisprudence where it had not been stayed or supplanted by statutory enactment, in so far as it was applicable to our conditions and circumstances."

The limitation on the wide sweep application of the common law was to have in this jurisdiction, as laid down in Browning v. Estate of Browning, 3 N.M., Gild. (E.W.S.) 659, Gild. (B. W. Co.) 460, Johns. 371, 9 P. 677, 684, to which reference is

made in the foregoing quotation from Beals v. Ares, is set forth in the following language from the former case, to-wit:

"We are, therefore, of opinion that the legislature intended by the language used in that section, to adopt the common law, or lex non scripta, and such British statutes of a general nature not local to that kingdom, nor in conflict with the constitution or laws of the United States, nor of this territory, *which are applicable to our condition and circumstances,* and which were in force at the time of our separation from the mother country." (Emphasis mine.)

Thus it is that the common law doctrine of riparian rights was transplanted into this jurisdiction in its entirety unless rejected because deemed inapplicable "to our condition and circumstances." If deemed inapplicable in its entirety, then no part of that doctrine was ever the law of New Mexico. But the mere fact that some parts of it were unsuited to local conditions did not have the effect of condemning the entire doctrine thus resulting that we separated the wheat from the chaff, as it were, retaining the good and rejecting the bad. In other words, to speak figuratively as we did in Beals v. Ares, supra, and likening the riparian rights doctrine to a cloud, when it began to settle over our jurisprudence it found much of the field elsewhere completely occupied by it already taken over by this so-called Colorado doctrine based upon diversion of waters and application to beneficial use. These strange peaks, which to carry on the figure will represent the Colorado doctrine, rising to dispel and displace the descending cloud, prevented much of the latter from ever finding lodgment here. But to the extent the field was not completely occupied by them, the cloud continued to descend and, as said in Beals v. Ares, "came in and filled every crevice, nook and corner in our jurisprudence."

And so it is that in the "crevices, nooks and corners" of our jurisprudence, never supplanted or repealed by any hostile legislation, will be found in our law so much of the common law doctrine of riparian rights as does not conflict with a full exploitation of the dominant purposes of the contrary doctrine, in full flower here at the time of the adoption of the common law. In other words, to paraphrase the language of this court in Beals v. Ares the riparian rights doctrine "gave way only in so far as the Colorado doctrine conflicted with its principles. In so far as was possible the doctrine of riparian rights operated in conjunction and harmony with the Colorado doctrine."

The majority do not so much as attempt to point out, nor can they, in what respect the retention by the landowner of his exclusive right of fishery in a non-navigable stream crossing his land is either destructive of or inconsistent with the fullest exploitation by the public of the diversion of such waters from the stream and their application to beneficial use, whether such use be for mining, milling, irrigation,

manufacturing, power, or for any other known use to which water may be dedicated. Until this showing can be made, the exclusive right of fishery survives.

My conviction that the appellee has the exclusive right of fishery rests fundamentally upon the proposition that such was his right at common law, and that our legislature and decisions have not thus far seen fit to deny him, or take from him, that right. It is a rule of construction, well recognized, that the common law is to be deemed superseded only when such a holding seems inescapable. 12 C.J. 186, 15 C.J.S., Common Law, § 12, p. 619. It is presumed to continue in force until displaced by express statutory authority, or compelling reasons of public policy. Neither reason for its displacement or for superseding it appears here.

While this exclusive right of fishery may seem unimportant at first blush, in my opinion, it is of the very highest importance because it rests upon the same foundation as that which supports the age-old dominion of an owner over his freehold estate. It may not be amiss to recall that for some time there has been a developing school of thought holding to the proposition that the great natural resources of mankind, so essential to human welfare, should not lie in private ownership. I will mention only a few, such as coal, oil, natural gas, etc. The philosophy back of such an idea is that God placed these great natural resources in the bowels of the earth, and that no single individual should be permitted to acquire

ownership in them. It is the old struggle —public against private ownership—limited, for the time being, at least, to the great natural resources so essential to man's existence. Extended beyond that and embracing all kinds of property, it would, of course, create a communal state. Naturally, such a philosophy is directly opposed to our system of privately owned property as the reward of free enterprise.

The extremes of the two schools of thought, private ownership versus public ownership, must meet and compromise on common ground as to some of these properties, such as coal, oil, natural gas. The claim of common ownership must be satisfied with government control and conservation in the interest of the public. As to such an essential as water, of course, we have the outright constitutional declaration that, when in natural streams, it belongs to the public. But we have never yielded to the idea that natural resources, such as coal, oil and natural gas belong to the public. They are still the subject of individual ownership as a reward of private enterprise. And even as to waters, the public interest therein is absolute only to the extent necessary to accomplish the dominant purposes provoking the declaration that they belong to the public. The right of fishery as here involved is not one of those purposes.

The wild berries growing upon my land are exclusively mine, and merely because they are wild no stranger has the right to trespass and pick them. The exclusive

right of fishery in non-navigable streams is just as sacred as an owner's exclusive right to pick wild fruit and berries upon his own land. When, by virtue of public ownership of waters flowing in natural streams, we take away from an owner through which a non-navigable stream flows rights in such waters appurtenant to ownership of the land and unessential to the attainment by the state of the dominant purposes underlying the constitutional declaration that such waters belong to the public, then, in truth and reality are we violating the constitutional inhibition against the taking of private property for public use without just compensation. It is my prediction that it will represent but the first step toward taking away other rights until now deemed no less secure.

The constitutional declaration on the subject of waters but recognized the existing status of perennially flowing streams, as it had been established by custom and judicial decision in the semi-arid west. And that custom and those judicial decisions uproot the common law only to the extent of holding such waters in trust in the state for appropriation to public uses. Until such time the common law right of the landowner in the use of waters flowing across his land remains, including his exclusive right of fishery. It can no more be taken from him, *lawfully*, without just compensation, than can a right of way for a ditch, to convey such waters to the land of his neighbor.

Let me put the matter in this way: A owns land across which flows a perennial stream carrying a substantial flow of unappropriated waters. Thus, without in any manner impairing or curtailing the use of waters in the stream by those having lawful priorities therein by virtue of vested or licensed applications to beneficial use, A uses the waters on his lands for irrigation, for powering a mill, for watering his stock, or for any other needed purpose. Has he committed a trespass? If so, against whom? If not, then by what right has he enjoyed the use of such waters if not as a hereditament, corporeal or incorporeal, attached to his land and incident to his ownership thereof? And, if it be either, where do you find it defined as such, if not in the common law? Neither man-made laws nor human declarations, in statute or constitution, can revoke or nullify a law of nature. Joshua made the sun stand still and Moses opened a way across the Red Sea for the children of Israel but all of us believe God had something to do with those miracles.

And so it is that when water in the form of rain from the heavens falls on A's land and flows by natural drainage across the same to the channel of some stream, enriching and irrigating as it flows, even after entering the channeled stream, what constitutional or statutory declaration that such waters are "public" or "belong to the public" can gainsay to the landowner such advantage as a natural right incident to his ownership of the land? Nor can the state, as trustee of these waters for the public, with any greater claim in reason, logic or law, challenge any use he might make of

unappropriated waters while on his premises that neither impairs nor diminishes the use by vested or licensed applications to beneficial use by other appropriators.

I make no argument that appropriation of waters to recreational purposes, such as fishing, boating and the like, may not be deemed a beneficial use and properly so—I have conceded that all along. Nor do I deny that private property may be taken for devoting waters to such purposes upon a proper showing and compensation to the owner therefor and for the rights and privileges incident to ownership of such property. All I claim in this connection is that before you can take from me my exclusive right of fishery in nonnavigable waters flowing across or on my land, you must compensate me for it just as you would if you took a part of my land. And such was the view, too, of the public authorities when they made the contracts and conveyances which gave rise to this controversy. The majority appraise the right of fishery very highly in establishing its character as a beneficial use but reduce it to a low estate or rank in a holding which takes it from the landowner as an exclusive right without compelling payment therefor.

It is interesting to note how the majority escape the effect of the damaging admission they are forced to make that at common law the right of fishery in these waters in their original state flowing over appellee's land was exclusive. They do it by qualifying the admission instead of admitting it outright as immemorially declared in text and decision. The rationale of the prevailing opinion is to admit only that *enjoyment* of the right is exclusive. The reasoning runs that the public has possessed the right all along but because only the owner is so situated that he can enjoy it without trespass, such enjoyment and not the right itself, is exclusive. This is drawing the bead too fine for me and such reasoning ignores and blinds itself to the fact that the right springs from ownership of the land—not as a mere *accident* of ownership but a *prerogative* of ownership. Furthermore, it is pertinent to inquire: Does that attain the dignity of a right in any one of the one hundred thirty five million people populating this country each of whom is said to possess this common right, save in him alone who can lawfully enjoy it? The question answers itself.

Only one case has been called to our attention that is exactly in point. It is Hartman v. Tresise, 36 Colo. 146, 84 P. 685, 4 L.R.A.,N.S. 872. It fully sustains the appellee in the case at bar in its contention that its right of fishery in the waters in question is exclusive. The decision was by a divided court and the majority here elect to follow the minority or dissenting opinion rather than the majority holding which, to my mind, is much the better supported in logic and reason. Any effort to weaken its force by the circumstance that the decision is by a divided court or that the court rested its decision as well on another point, Chase v. Lujan, 48 N.M. 261, 149 P.2d 1003, in no manner detracts from it as supporting

authority. In so far as a decision of the question discussed so much at length hereinabove is concerned, I am quite willing to rest my dissent upon the Colorado case just cited. Its reasoning is unanswerable.

There is still another support for the judgment rendered which is absolutely conclusive of its correctness. 1941 Comp., § 43-301(9), so far as material, provides:

"(9) No * * * fishing license shall entitle the holder therefor to * * * fish * * * within or upon any privately owned enclosure *without consent of the owner."* (Emphasis mine.)

Apparently, this statute was not called to the attention of the trial court. Its effect is twofold. First, it is a legislative recognition that the law on the main question is as contended by appellee. In the second place, even if appellee be wrong in its contention, this statute stands as an insuperable barrier against awarding appellant the relief prayed. It has never been declared invalid. Indeed, its validity has never been challenged. The state which issues the license may impose such reasonable conditions on its use as it sees fit. But, reasonable or unreasonable, this condition stands as an effective barrier to a holder doing the very thing appellant asks this court to declare he has the right to do, unless and until at a proper time and in a proper forum, it is stricken down. The declaration of its unconstitutionality in the prevailing opinion, in order to support reversal, reviews no ruling of the trial court and is contrary to all precedent by reason thereof. Hutchens

v. Jackson, County Treasurer, 37 N.M. 325, 23 P.2d 355.

In an effort to avoid the damaging effect of this statute, it will not do to urge that it injects a new theory. It does nothing of the kind. Mayfield v. Crowdus, 38 N.M. 471, 35 P.2d 291. It is simply another good reason supporting the judgment rendered and properly to be considered, even, if the one upon which the trial court rested judgment should prove wrong. Lockhart v. Wills, 9 N.M. 344, 54 P. 336. Nor does it lie in appellant's mouth to claim there is no proof that these waters are within a private enclosure. State Game Commission is relator herein. Its members and employees of all persons within the state are presumed to know the game and fish laws. If it be the law, as appellant urges and the majority hold, that appellee does not possess the exclusive right of fishery in these waters, such has been the law all along and the state and the relator cannot be excused for ignorance thereof. Thus the only plausible explanation that can be given why appellant saw fit to contract the right of fishery over any part of the waters impounded by the Conchas Dam is that they lay within the private enclosure of an owner whose consent was required under the statute in question. But for the statute, if the law on the main question be as today declared, there was no occasion to contract for a right of fishery. The state—the public—possessed it already. The appellant may not now avoid the conclusive effect of its act in this behalf by pleading ignorance of the law.

I heartily concur in the able dissenting opinion of my brother Bickley which establishes convincingly that, until today, the law was as claimed by the appellee. Regrettably, the result of this decision is to tear down safeguards which have existed almost from the beginning where Anglo-Saxon jurisprudence prevails for the protection of an individual's dominion over his own property. The common law has dramatized the sanctity of the home and premises of the individual against invasion by strangers and trespassers in the age-old maxim: "A man's house is his castle." So it was and immemorially has been but no more, to view the matter realistically, since henceforth a rod, reel and fly are to perform the office of a writ of entry.

I dissent.

### On Motion for Rehearing.

BRICE, Justice.

On consideration of motion for rehearing our conviction as to the correctness of the result reached in the majority opinion is not weakened, but strengthened rather. It is asserted by appellee in its motion for rehearing, that the Pablo Montoya Grant was public domain of the United States from July 4, 1848, the effective date of the Treaty of Guadalupe Hidalgo, 9 Stat. 922, until March 3, 1869, the date of the Act of Congress, 15 Stat. 342, confirming the grant, and probably up to the date of the patent, which was April 20, 1877. Then appellee, assuming the truth of its assertion, contends that the United States owned both the land and the unappropriated water composing the grant, at the date of its confirmation or patent, and that all water thereon not theretofore appropriated to some beneficial use, became the property of appellee as assignee of the United States, and that the Mexican-Spanish law is not involved.

As a basis for this conclusion it is said that the original Mexican grant was void because at the date of the purported grant by officials of the Mexican territory of New Mexico to Pablo Montoya (1824), those officials were without power to make the grant, and therefore the land remained the property of the Mexican government until its cession to the United States. In support of this claim appellee cites Hayes v. United States, 170 U.S. 637, 18 S.Ct. 735, 42 L.Ed. 1174.

There are a number of answers to this contention, any one of which is decisive and opposed to appellee's contention.

First. The appellee requested the court to find, and the court did find, the following facts:

"That the Pablo Montoya Grant was made by the Republic of Mexico prior to the American occupation, was favorably reported to Congress by the Surveyor General of New Mexico, was confirmed by Act of Congress approved March 3, 1869, was surveyed under the direction of the United States, and was patented by the United States April 20, 1877; that the confirmation, survey and patent of said grant were

without any exceptions whatever, and the said survey and patent described only the exterior boundaries of the grant and included everything within such exterior boundaries, including the South Canadian and Conchas Rivers which were not meandered in said survey or in any manner excluded from the patent or the grant."

By the terms of Articles 8 and 9 of the Treaty of Guadalupe Hidalgo and Article 5 of the Gadsden Treaty, 10 Stat. 1031, the United States was bound to protect the private rights of property which had been acquired by Mexican citizens in the ceded territory. Under these treaties perfect titles to grants of land needed no confirmation by the political authorities of the United States to establish their validity. Ainsa v. New Mexico & Arizona R. Co., 175 U.S. 76, 20 S.Ct. 28, 44 L.Ed. 78; Board of Trustees, etc. v. Brown, 33 N.M. 398, 269 P. 51.

The foregoing finding judicially determined that the grant in question was made by the Republic of Mexico, not by some unauthorized person in its name. If so made, the grant will be assumed to be perfect, needing no confirmation.

A history of this grant, as shown by the record and the statutes of the United States, is not out of place here.

For the purpose of providing for the establishment of existing rights acquired under the Mexican Government in the Territory of New Mexico, and to segregate them from the public lands of the United States, the Congress enacted the act of July 22, 1854, establishing the office of surveyor general of New Mexico and providing for his jurisdiction and duties, as follows:

"That it shall be the duty of the Surveyor-General, under such instructions as may be given by the Secretary of the Interior, to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages, and customs of Spain and Mexico; and, for this purpose, may issue notices, summons witnesses, administer oaths, and do and perform all other necessary acts in the premises. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo, of eighteen hundred and forty-eight, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same under the laws, usages, and customs of the country before its cession to the United States; * * * which report shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm bona fide grants, and give full effect to the treaty of eighteen hundred and forty-eight between the United States and Mexico. * * *" 10 Stat. 309.

The Surveyor-General acting within the authority conferred by Congress examined into the validity of the Pablo Montoya Grant and filed his decision on November 20, 1860, which is in part as follows:

"This grant, filed April 11, 1860, was called up for investigation, November 6,

1860, in the office, Don Pablo Montoya, deceased, original claimant, petitioned the provincial deputation of the Territory of New Mexico for a grant of land lying in Red River in the County of Taos, * * *

"On the 19th day of November, 1824, the provincial deputation answered in due form the petition of the said Don Pablo Montoya, and granted the lands petitioned for according to the laws and usages of the Mexican Government. The original grant to Don Pablo Montoya now being in the archives of this office, the verbal testimony which was taken here, proving the signatures to the papers, and the occupancy of the land up to the death of Montoya, some fourteen years, and the hostility of the Indians after that time, which forced his family to return, prove the validity of the claim, and the right of his heirs to the full enjoyment of this property. * * * Therefore, in view of these clearly defined points in this case, this office approves of this claim, and to the fullest extent recommends to the Congress of the United States the final confirmation of this claim to the petitioners, the children and grandchildren, the heirs at law of Don Pablo Montoya, deceased."

Thereafter, by the act of March 3, 1869, the Congress of the United States confirmed this grant as private land claim "No. 41" and further provided:

"That such confirmation shall only be construed as a quitclaim or relinquishment of all title or claim on the part of the United States to any [state] lands not improved by or on behalf of the United States, and not including any military or other reservation embraced in either of the said claims, and shall not affect the adverse rights of any person or persons to the same, or any part or parcel thereof."

Thereafter, on the 20th day of April, 1877, a patent was issued to the heirs of Pablo Montoya, covering the Pablo Montoya Grant, in which is recited the decision of the Surveyor-General and the confirmation of the grant by Congress. The patent recites that the United States "Have given and granted and by these presents do give and grant unto the said children and grandchildren, the heirs at law of Don Pablo Montoya, deceased, and to their heirs and assigns the tract of land embraced and described in the foregoing survey." This recital is limited by the confirming act, which authorized the issuance of a patent quitclaiming the interest of the United States in the grant, and reserving to all third persons any interest they might have therein.

Aside from the findings of the trial court that the land was granted by the Republic of Mexico to Pablo Montoya, the question of its validity was considered and determined by the legally constituted authorities of the United States upon the application of Pablo Montoya or his heirs.

The congressional confirmation and United States patent as between the United States and the heirs of Pablo Montoya, was conclusive as to the validity of the Mexican grant. Only third persons could question the grantee's title. Board of

Trustees of Anton Chico Land Grant v. Brown, 33 N.M. 398, 269 P. 51; Beard v. Federy, 3 Wall. 478, 18 L.Ed. 88.

In Hayes v. United States, 170 U.S. 637, 18 S.Ct. 735, 739, 42 L.Ed. 1174, the Supreme Court said:

"Reviewing such acts (congressional land grants acts), the conclusion was reached that it was the intention of Congress that a claimant should not be required to offer proof as to the authority of the officials executing a public grant, but that the court should, in deciding upon a claim, assume as a settled principle that a public grant is to be taken as evidence that it issued by lawful authority. And in the Peralta Case [U.S. v. Peralta, 60 U.S. 343], 19 How. 343 [15 L.Ed. 678] in a proceeding under the act of March 3, 1851, relating to lands in California, the doctrine of the Arredondo Case [U.S. v. Arredondo, 6 Pet. 691, 8 L.Ed. 547] was applied."

The above had reference to the manner of confirming Mexican land grants before the establishment of the Court of Private Land Claims, which had jurisdiction of the controversy in the Hayes Case.

The question of the validity of grants made by the officials of the Territory of New Mexico in 1823 and 1825 was before this court in Stoneroad v. Beck, 16 N.M. 754, 120 P. 898. It was held by this court that the authorities of the Territory of New Mexico were not authorized to issue either patent involved in that case, and that both were void under the Mexican law.

However, the grants had been confirmed by act of Congress and patents issued, based upon alleged void Mexican grants. It was determined that both being void originally under Mexican law, that as the United States patents had issued, each had the same standing, applying the principles of Southern Pacific R. Co. v. United States, 183 U.S. 519, 22 S.Ct. 154, 46 L.Ed. 307.

But the Supreme Court of the United States, in reversing this court (Jones v. St. Louis Land & Cattle Co., 232 U.S. 355, 34 S.Ct. 419, 420, 58 L.Ed. 636), stated:

"The act of Congress was not a gratuity, it was intended to be a discharge of the obligations of the treaty between the United States and Mexico. It was a confirmation of rights which existed, *and as they existed.*" (My emphasis.)

It was then stated that the report of the surveyor general approving the Mexican grants was the basis of the act of Congress confirming them, and further:

"The proceedings, therefore, for the confirmation of titles derived from Mexico, commenced with the surveyor general, and were consummated by the confirming act, the surveyor general deciding in the first instance. The petition to him 'is the commencement of proceedings, which necessarily involve the validity of the grant from the Mexican government.' Congress, however, constituted itself the tribunal of ultimate decisions of the validity or invalidity of the claim, as, of course, it might do in the discharge of the treaty obliga-

tions, or delegate that duty to the judicial department. * * *

"The confirmation, therefore, cannot be disassociated from what preceded it, and it may be said of such direct confirmation * * * through special tribunals created by Congress, that it constitutes a declaration of the validity of the claim under the Mexican laws, and that the claim is entitled to recognition and protection by the stipulations of the treaty."

It thus appears that a confirmation by Congress under the congressional act involved, determined that a Mexican grant was valid, and when so determined the courts are not authorized to go behind this adjudication, unless the rights of third persons are involved, as in Board of Trustees v. Brown, supra. At the time of the grant the question was solely a political one, determinable alone by the political department of the government and its judgment was final. Appellee cites Hayes v. United States, supra, in support of its contention. But in the Jones case, [232 U.S. 355, 34 S. Ct. 421] the Supreme Court of the United States said:

"We are not called upon to consider the power of the territorial officers (referring to New Mexico as a territory of Mexico). The validity of the grants has been pronounced by Congress, and we are only required to consider their relation to each other and the public domain;"

And substantially the same doctrine was stated in the Hayes Case, hereinbefore quoted.

It may be, and probably is, true that the territorial deputations of the Mexican Territory of New Mexico were without power to grant land during the years of 1824 to 1828. Chaves v. United States, 175 U.S. 552, 20 S.Ct. 201, 44 L.Ed. 269; United States v. Vallejo, 1 Black 541, 17 L.Ed. 232; Hayes v. U. S. supra; Board of Trustees v. Brown, supra. But that question was not, and could not be, raised in this case, not only for the reasons before stated; but under well settled rules of law, the appellee will not be permitted, when its interest may be adversely affected, to deny the source of its title as vouched for by the Mexican claimant, after the United States Government, relying thereon, confirmed the grant as legal and subsisting at the date of cession to this country.

The validity of the Mexican grant having been determined by the authorities, and in the manner provided by law, this court, upon the record before us, is bound by that adjudication.

The rights of appellee to the water and fishery are exactly the same as those of the owner of any valid Mexican grant confirmed by Congress prior to the Act of 1891, 26 Stat. 854, establishing the Court of Private Land Claims.

It is next asserted that "The United States owned both land and water on its public lands and all water rights on such lands must come within some act of Congress, and no act of Congress has ever

recognized the public rights as determined in the decision in the case at bar."

In support of this proposition, dictum first stated in Howell v. Johnson, C.C., 89 F. 556, 558, is quoted by appellee, as follows:

"The legislative enactment of Wyoming was only a condition which brought the law of congress into force. The national government is the proprietor and owner of all the land in Wyoming and Montana which it has not sold or granted to some one competent to take and hold the same. Being the owner of these lands, it has the power to sell or dispose of any estate therein or any part thereof. The water in an innavigable stream flowing over the public domain is a part thereof, and the national government can sell or grant the same, or the use thereof, separate from the rest of the estate, under such conditions as may seem to it proper."

This case was followed in California-Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 162, 55 S.Ct. 725, 731, 79 L.Ed. 1356, in which the Supreme Court said:

"As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. Howell v. Johnson, C.C., 89 F. 556, 558. The fair construction of the provision (Desert Land Act of March 3, 1877) now under review is that Congress intended to establish the rule that for the future the land should be patented separately; and that all nonnavigable waters thereon should be reserved for the use of the public under the laws of the states and territories named."

In Ickes, Sec'y, v. Fox, 300 U.S. 82, 57 S.Ct. 412, 417, 81 L.Ed. 525, the Supreme Court stated:

"The Federal government, as owner of the public domain, had the power to dispose of the land and water composing it together or separately; and by the Desert Land Act of March 3, 1877 * * *, *if not before*, Congress had severed the land and waters constituting the public domain and established the rule that for the future the *lands should be patented separately*. Acquisition of the government title to a parcel of land was not to carry with it a water right; but all nonnavigable waters were reserved for the use of the public under the laws of the various arid-land states." (My emphasis.)

In neither case was the "ownership" of water involved. So far as I am informed no court has ever held that lands granted by a United States patent carried title to running water passing through them. In those states in which the common law of riparian rights is in force, the patents of the United States conveyed to the grantee "no property in the water itself, but a simple usufruct while it passes along." United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 775, 43 L.Ed. 1136. Likewise, patents to land in the arid states have never been

held to convey as property the running water on the granted land.

■ But we need not trouble ourselves about the question of the ownership of water in running streams on public lands. Appellee's patent was dated April 20, 1877, after the Desert Land Act (Act of March 3, 1877, 19 Stat. 377, 43 U.S.C.A. § 321 et seq.) had become effective. Assuming that the appellee's title is from the United States, unaffected by any previous Mexican grant, the title to the flowing water was not included in the conveyance; for by the Desert Land Act, " * * * if not before, Congress had severed the land and waters constituting the public domain and established the rule that for the future the lands should be patented separately." Ickes, Sec'y, v. Fox, supra. Appellee obtained no title to water or to its use by virtue of the patent from the United States.

The appellee states:

"*The Mexican laws have no application.* We recognize that the laws or customs of the Republic of Mexico might constitute local customs or laws within the meaning of the Act of Congress of July 26th, 1866, above referred to, and that a water right acquired by individuals or by a corporation for mining, agricultural, manufacturing or similar purposes under such laws or customs would be entitled to the protection of the Act of Congress referred to. This is the effect of the decision in Boquillas Land & Cattle Co. v. Curtis, 213 U.S. 339, 29 S.Ct. 493, 53 L.Ed. 822, but in no other way can the laws or customs of the Republic of Mexico have any application."

■ It is certain that the customs and laws of the Republic of Mexico are the basis for the public control of water in New Mexico, but whether any rights greater than those mentioned by appellee remained in the public, I do not find it necessary to determine. It was stated in the case cited:

"So far as the claim is rested on the original grant and the Mexican law, it may be disposed of in a few words, without going into all the questions that would have to be answered before an opposite conclusion could be reached. 'Whatever may have been the general law throughout the Republic of Mexico on the subject of water, it is reasonably certain that, in the state of Sonora, the doctrine of appropriation, as now recognized, was to some extent in force by custom. In this territory irrigation was practiced in the Santa Cruz Valley prior to the cession, and it is well known the right of appropriation without regard to the riparian character of the lands was there in force probably from the time when the Spaniards first settled in the valley. Our statutes, as well as those of New Mexico, seem to have had their origin in the Mexican law as modified by custom.' This is the statement of the territorial court, and we know nothing to control it. It is not met by arguments as to the general character of Mexican law, or by inference from the situation and nature of the grant. * * *

"But, while it is true that in Beard v. Federy, supra [3 Wall. 478, 491, 18 L.Ed. 88, 92], Mr. Justice Field calls such a patent a quitclaim, we think it rather should be described as a confirmation in a strict sense. 'Confirmation is the approbation or assent to an estate already created, which, as far as is in the confirmer's power, makes it good and valid; so that the confirmation doth not regularly create an estate; but yet such words may be mingled in the confirmation, as may create and enlarge an estate; but that is by the force of such words that are foreign to the business of confirmation.' Gilbert, Tenures, 75. It is not to be understood that when the United States executes a document on the footing of an earlier grant by a former sovereign, it intends or purports to enlarge the grant. The statute under which the Mexican title was decided to be good speaks of confirmation throughout, and, in the most pertinent passage, directing a patent to be issued, says that it shall be issued 'to the confirmee.' Act of March 3, 1891, Chap. 539, § 10, 26 Stat. at L. 854, 859, U.S.Comp. Stat.1901, pp. 766, 771. It would be possible, perhaps, to argue to the contrary from provisions in §§ 8 and 13, that the confirmation shall only work a release of title by the United States, but we are satisfied that the true intent of the statute and the reason of the thing are as we have said." Boquillas Land & Cattle Co. v. Curtis, supra [213 U.S. 339, 29 S.Ct. 494].

This would seem to indicate that the appellee has only the title and rights conferred by the Mexican grant. Appellee cites H. N. D. Land Co. v. Suazo, 44 N.M. 547, 105 P.2d 744, as holding that in confirming Mexican land grants the title and rights acquired by the act of confirmation are not limited by conditions or limitation imposed by the laws of Spain or Mexico. The land involved in the case mentioned was concededly public land at the time of the cession, and title had never passed from the Mexican Government. But whether it had or not, it is immaterial in this case.

In 1907 the legislature of New Mexico enacted a comprehensive law for the control of water in streams and water courses entitled "An Act to Conserve and Regulate the Use and Distribution of the Waters of New Mexico," etc., which provided among other things:

"Section 1. All natural waters flowing in streams and water courses, whether such be perennial, or torrential, within the limits of the Territory of New Mexico, belong to the public and are subject to appropriation for a beneficial use.

"Sec. 2. Beneficial use shall be the basis, the measure and the limit of the right to the use of water * * *." Ch. 49, N. M.L.1907.

This was carried into the Constitution, written in 1910, as follows:

"The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use

in accordance with the laws of the state. Priority of appropriation shall give the better right." Sec. 2, Art. 16, N.M.Const.

The common law was adopted as the rule of practice and decision in the Territory of New Mexico in 1876, Laws 1876, c. 2, § 2. Of this act this court, through Mr. Justice Roberts, in Beals v. Ares, 25 N.M. 459, 185 P. 780, 788, said:

"When the legislature in 1876 adopted the common law as the rule of practice and decision, the whole body of that law as limited in the case of Browning v. Estate of Browning, supra, [3 N.M. (Gild.) 659, 9 P. 677] came into this jurisdiction. Where it found a statute counter to its provisions, it yielded to the statute, but it gave way only in so far as the statute conflicted with its principles. In so far as was possible it operated in conjunction and harmony with the statutes. If the statute conflicted with it, it bided its time and upon repeal of the statute became again operative. In other words, the common law, upon its adoption, came in and filled every crevice, nook and corner in our jurisprudence where it had not been stayed or supplanted by statutory enactment, in so far as it was applicable to our conditions and circumstances. Where a statute existed at that time, patterned after the civil law, or copied from some other state or country and it conflicted with the common law, such common law occupied all the field of jurisprudence not actually covered by the statute, and, upon repeal of such statute, the common law immediately took posses-

sion and resumed its sway over the rights and remedies theretofore regulated by such statute."

Justice Roberts' statement that the common law fills "every crevice, nook and corner" of the law except the statutes is not quite accurate. Before we had any statute on the subject of the ownership or use of water, and after the adoption of the common law as the rule of practice and decision in this jurisdiction, the territorial Supreme Court had accepted as the law of the Territory those rules that custom had established for its use, patterned after the Spanish-Mexican law, wholly unknown to the common law. The Albuquerque Land & Irrigation Co. v. Gutierrez, 1900, 10 N. M. 177, 61 P. 357, affirmed in 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588.

Regarding the acts of Congress recognizing the right to the use of water in streams and lakes on public lands, it was further stated in California-Oregon Power Co. v. Beaver, etc. Co., supra:

"The effect of these acts is not limited to rights acquired before 1866. They reach into the future as well, and approve and confirm the policy of appropriation for a beneficial use, as recognized by local rules and customs, and the legislation and judicial decisions of the arid land states, as the test and measure of private rights in and to the nonnavigable waters on the public domain. * * *

"If the acts of 1866 and 1870 did not constitute an entire abandonment of the common-law rule of running waters in so

far as the public lands and subsequent grantees thereof were concerned, they foreshadowed the more positive declarations of the Desert Land Act of 1877, which it is contended did bring about that result." * * *

" * * * The fair construction of the provision now under review (Act of 1877) is that Congress intended to establish the rule that for the future the land should be patented separately; and that all nonnavigable waters thereon should be reserved for the use of the public under the laws of the states and territories named. * * *

"Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, if not before, all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain. For since 'Congress cannot enforce either rule upon any state,' * * * the full power of choice must remain with the state."

The old customs and rules were continued in force by the courts as the law of this jurisdiction until they were, in whole or in part, enacted into statutes or incorporated into the state constitution. See Ch. 49, N.M.L.1907 and Sec. 2, Art. 16, N.M.Const.

On the principal question the appellee contends that the declaration of public ownership of waters in streams in this statute and in the Constitution, means "public" ownership only in the sense that they might be appropriated for irrigation and other public uses; that is "has no application to fishing rights," which it is asserted are common law rights and are the exclusive property of the owner of the bed of the stream.

On the other hand appellant contends that appellee has not now, and never has had, any exclusive right to fish in the water on the Pablo Montoya Grant or in any part of the Conchas Lake; that all the waters involved belong to the public, from which it follows, as appellant asserts, the public has a common right to fish therein if it can be done without trespassing on private property. If appellee owns the beds of the streams on the Pablo Montoya Grant, as claimed by it, (a question I do not decide) it obtained no interest of any kind (riparian or otherwise) in the water flowing over those beds by virtue of its United States patent. This water was reserved to the people by federal laws. California-Oregon Power Co. v. Beaver etc. Co., supra.

I do not doubt but that the water of non-navigable streams had been severed

from the public domain of the arid west long before the passage of the desert land act of 1877, by prior acts of Congress as well as by the government's recognition of the customs, laws and court decisions of the western states in relation thereto as intimated in the Ickes Case, and in California-Oregon Co. v. Beaver, etc., Co., supra. If appellee has any fishing rights in the Conchas Lake, it is only by virtue of the statute of 1876 adopting the common law as the rule of practice and decision in this jurisdiction.

The early cases involving fishing rights followed the common law in holding that the beds of fresh water streams where the tide did not ebb and flow belonged to the riparian owners, and in one or two early cases this was held to apply to the Mississippi River. But it was soon discovered that the common law was not suitable to this country, in which there were fresh water navigable streams thousands of miles in length. I have referred to the decisions of the United States Supreme Court, but call particular attention to People ex rel. Loomis v. The Canal Appraisers, 33 N.Y. 461, overruling earlier New York cases, and McManus v. Carmichael, 3 Iowa 1, in which practically all of the cases to that time were reviewed. In New York, Iowa, and many other states, the civil law, which held that all streams navigable in fact were navigable in law, was adopted with the conclusion that such streams were public streams and that the public had the right to resort thereto for fishing and other purposes that did not interfere with naviga-tion. Regarding the adoption of the civil law the New York court said:

"The rule of the civil law, as already observed, is well defined, of universal recognition on the continent of Europe, and, we have clearly seen, better adapted to the state of things on the continent of America than that which arose from the condition of the waters of the island of Great Britain. * * *

"Navigable rivers, in the language of the civil law, are not merely rivers in which the tide flows and reflows, but rivers capable of being navigated, that is navigable in the common sense of the term. In the words of the Digest, a navigable river is 'statio iturve navigio,' or, as Lord Mansfield observed, 'ex facto oritur jus.' The Code Napoleon defines, with precision, rivers navigable and those not navigable, and the soil of the former belongs to the nation, and that of the latter, and islands which may be formed therein, to the proprietors of the shore on that side where the island is formed. * * * We have now ascertained the doctrine of the common law, and that of the civil law, upon the subject now under consideration, and have traced the same to their respective sources. We have seen, in applying the principles of the common law to the waters of this continent, how great has been the embarrassment of courts and judges and text writers; how variant have been the conclusions reached by them, and how contradictory and unsatisfactory have been the reasons for the results arrived at."

It does not always follow that the owner of the bed of a stream owns the fishing rights therein. It is the law of England at the present time, and generally in this country, that the fact of ownership of the bed of a stream is not the criterion for the determination of the right to fish therein. The question depends upon whether the waters are public or private. Wyatt et al. v. Attorney General [1911] A.C. 489, 21 Ann.Cas. 775, affirming the Supreme Court of Canada in holding that the public and not the owner of the bed of a navigable stream owns the fishing rights therein. This case is followed by an annotation in 21 A.&E.Ann.Cas. entitled "The right of fishing in a navigable river is generally in the public, even though the bed thereof may be owned by the owners of land along the river."

The principal American case on this question is Willow River Club v. Wade, 100 Wis. 86, 76 N.W. 273, 42 L.R.A. 305. I call attention to the following texts in further support of this proposition:

"In accordance with the general rules announced in the preceding sections, it is not disputed that the public has a prima facie right to fish in all navigable streams, just as it has in other public waters, even though the beds thereof may be owned by the riparian owners. A riparian owner has no exclusive right to a fishery in tidal or navigable waters. Hence, a stranger has a right to row a boat upon navigable streams flowing through private property and to take fish from the water, provided he does not trespass on the adjacent property." 22 A.J., Fish and Fisheries, Sec. 16.

"As a general rule all the members of the public have a common and general right of fishing in public waters, such as the sea and other navigable or tidal waters, and no private person can claim an exclusive right to fish in any portion of such waters, except in so far as he has acquired such right by grant or prescription, as discussed in § 9, infra. This rule applies notwithstanding the title to the bed of such a stream is in the riparian owner, and notwithstanding his ownership of the abutting upland carries with it the right of access to deep water." 36 C.J.S., Fish, § 6.

And see annotation in 60 L.R.A. 481 entitled "Right to fish."

The only question remaining that is material to a decision is whether the waters involved in this suit are public waters.

I am unable to find in the declarations of public ownership of water in the laws and constitution of this state, from which I have quoted, any reservation of fishing rights or any other right existing at common law in connection with the usufructs of public water flowing by or through the lands of any person.

Water has been classified as "public" and "private," depending upon the rights to its use. No right to the use of water was conveyed to appellee by his patent, nor did it obtain any under the act of 1876 adopting the common law as the rule of practice and decision in this state. Under the fed-

eral statutes enacted while this was a territory, the declaration of public ownership of water was recognized and protected by the refusal of the government to convey any interest or right therein to patentees. Whether the legislature could confer fishing rights to the owners of lands adjacent to streams consistently with the constitution, I do not decide; but see Hume v. Rogue River Packing Co., 51 Or. 237, 83 P. 391, 92 P. 1065, 96 P. 865, 31 L.R.A., N.S., 396, 131 Am.St.Rep. 732, and 22 A.J. "Fish & Fishery" Sec. 12.

However this may be, no person has the right to approach public water through private property, or fish in public water while on private property without the consent of the owner; but he may fish in public water if he does not trespass upon the lands of another; and fishing in public water from a boat is not a trespass upon the property of the owner of the underlying land. Willow River Club v. Wade, supra; Diversion Lake Club v. Heath, 126 Tex. 129, 86 S.W.2d 441.

The appellee contends that the decision in the Diversion Lake Club Case is not authority here because the river which was dammed to make the Modina Lake was navigable in law, though not in fact; from which it was concluded that the water was public. But what difference does it make whether the public character of the water resulted from a declaration of the legislature that the stream was navigable, from which the inference that the water was public would follow; or that the declaration of its public character was made direct without the necessity of an inference? In either case the water was public, and the fact that the underlying soil belonged to individuals did not affect public rights therein, as the Texas court held.

It is said that "Another birthright of Anglo-Saxon (?) jurisprudence has been stricken down" by this court. If this were true, it would not be the first to fall by court action. The Supreme Court of the United States, and the courts of most of the states, have "stricken down" the claim that the right of fishery belongs to the owners of lands adjacent to thousands of miles of fresh water streams in this country, and no doubt these decisions were met with the same cry of destruction of ancient "birthrights." In truth the common law of private water in running streams has never been a part of the jurisprudence of New Mexico. These waters have always been public, and they have been confirmed as such by our statutes and constitution.

I concur in the proposed disposition of the case in the opinion by Mr. Chief Justice MABRY. The motion for rehearing is denied.

MABRY, C. J., and LUJAN, J., concur.

BICKLEY and SADLER, Justices (dissenting).

The majority, seemingly not quite satisfied to rest the result declared on what was said in their former opinion, have put for-

ward additional grounds considered by them as fortifying the position taken. In our view, the new matter written in disposing of the motion for rehearing merely represents confusion worse confounded. The extremity to which the majority are driven to find supporting argument is witnessed by the effort to impair what this court said long ago in Beals v. Ares, 25 N.M. 459, 185 P. 780, upon the status of the common law in our jurisprudence, for nearly thirty years regarded as a virtual chart and compass in the field occupied by the common law.

We are satisfied with what we have written in our former dissents. We there pointed out the fallacy in the argument advanced, as well as danger to the security of property rights involved, in the course embarked upon by the majority opinion. It is no answer to say that this invasion of a birthright of Anglo-Saxon jurisprudence does not represent the first encroachment. That frequently affords the explanation, although it furnishes no justification, for the denial of a right long cherished and deemed secure.

We reaffirm our dissent.

On Second Motion for Rehearing.

BRICE, Chief Justice, and LUJAN, Justice.

After appellee's first motion for a rehearing was overruled, it was granted leave to file and filed a second motion for rehearing. The cause is now before us on said motion.

It is said by the appellee that the majority opinion, in disposing of the first motion for a rehearing, "misconstrued appellee's contention as to the ownership of the water involved." Commenting on this point, the appellee states:

"We have never intended to contend, as stated on page 1 of the majority opinion on Motion for Rehearing [182 P.2d 457], that 'all waters thereon (on the Grant) not theretofore (prior to date of patent) appropriated to some beneficial use, became the property of appellee as assignee of the United States.' Nor have we intended to contend 'that lands granted by a United States patent carried title to running water passing through them.' (Opinion on Motion for Rehearing, page 7 [182 P.2d 460]). What we have contended, and do contend, is that after the patent, the water remained subject to appropriation for any beneficial use, but that any such appropriation or use must be derived from some Act of Congress permitting such appropriation or use, and that there is no such Act permitting use by the public for fishing or any other general use, the acts of Congress being limited to appropriation for some specific purpose.

"We start with the premise, which seems to be uncontroverted, that the United States owned both the land and water on its public domain, and had the right to dispose of the land and the water either together or separately. California Oregon Power Co. v. Beaver Portland Cement Co.,

295 U.S. 142, 145, 55 S.Ct. 725, 79 L.Ed. 1356, 1364.

"It disposed of its land by patent, but left the disposal of the water to appropriation for beneficial use under local customs and laws. It did not, however, give the states blanket authority to dispose of or permit the use of the water. * * *

"None of these acts of Congress give the public generally any right to use the water for fishing or otherwise. The rights given are those of appropriation to some specific beneficial use—'irrigation, mining and manufacturing.' As is stated in California Oregon Power Co. v. Beaver Portland Cement Co., supra, 'the only rule spoken of (in these acts of Congress) is that of appropriation.'

"We have then this situation in the case at bar: The United States owned both the land and the water. It has disposed of the land. It has authorized the acquisition of rights in the water by appropriation for specific beneficial purposes. It has not authorized the acquisition of rights by the public generally, and such right consequently can not exist."

We accept the statement of appellee that it did not contend that all waters on the grant not theretofore appropriated to some beneficial use became the property of appellee as assignee of the United States; nor that lands granted by a United States patent carried title to running water passing through them.

The statement in the majority opinion on rehearing, was in answer to the following statement in appellee's brief:

"It is, of course, well settled that the United States owned both the land and the waters on its public land, and had the right to dispose of land and water, together or separately. * * *

"The Pablo Montoya Grant was, as above stated, a part of the public lands of the United States, and the same was confirmed and patented without any restrictions or qualifications whatever. The confirmation and the patent purport to vest in the confirmee the complete title to everything within the boundaries of the Grant as surveyed. No mention is made of any reservation of any right in the public to fish in or use the waters of any stream within the Grant. Existing legislation of Congress saved vested rights to the use of water acquired by appropriation in accordance with local customs, but nothing more."

Appellee then states as its conclusion on the question:

"* * * Our contention is that after the patent issued for the Pablo Montoya Grant, anyone had, and now has, the right to appropriate this water for any of the purposes specified in the Acts of Congress above referred to, but that after such patent, the water could not be used for any purposes not specified in the acts of Congress."

But a pertinent question is, What interest has appellee in the water or its use?

Appellee, at least inferentially concedes, as indeed it must, that the United States patent to the Pablo Montoya Grant conveyed to its predecessor in title the land only, after the water had been severed therefrom. "As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. * * * That Congress intended to establish the rule that for the future (after March 3rd 1877) the land should be patented separately; and that all nonnavigable waters thereon should be reserved for the use of the public under the laws of the states and territories named." California-Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 160, 55 S.Ct. 725, 731, 79 L.Ed. 1356, and Ickes, Secretary v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525, quoted from in our opinion on motion for rehearing.

Regarding the interest of the state in the public waters within its boundaries, it is said:

"Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, if not before, all nonnavigable waters then a part of the public domain became publici juris, subject to the plenary control of the designated states, including those since created out of the territories named, with the right in each to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain." California Oregon Power Co. v. Beaver Portland Cement Co., supra.

The claim heretofore made, and upon which the minority opinion rests, is that the appellee as the owner of the land, had certain riparian rights in the water, among them the right of fishery; and that such rights were subordinate only to the rights of individuals who had appropriated the water and used it beneficially. Whether this contention has been abandoned is not plain; but we will assume that the present contention, to-wit that the state has not a plenary control over public waters, but that its authority is limited to providing for appropriations for irrigation, mining and manufacturing purposes is in addition to its claim of riparian rights, or the common law right of fishery.

The question of the extent of state control over public waters has been so definitely settled by decisions of the Supreme Court of the United States, and considered in our opinion on motion for rehearing, that but slight reference need be made here. These waters are publici juris and the state's control of them is plenary; that is, complete; subject no doubt to governmental uses by the United States. California Oregon Power Co. v. Beaver Portland Cement Co., supra; Ickes v. Fox, supra; Sec. 2, Art. 16, N.M.Const.; Ch. 49 N.M.L.1907. Mr. Justice Sadler in his dissenting opinion, states:

"I make no argument that appropriation of waters to recreational purposes, such as fishing, boating and the like, may not be deemed a beneficial use and properly so—I have conceded that all along."

But he believes that such right should be exercised by the State through condemnation proceedings. If the use of water for establishing public fisheries is a public use, within the meaning of our Constitution and laws, as Mr. Justice Sadler concludes, then it may be taken and appropriated for such use without condemnation. Such use is in the same category as that of use for irrigation, mining and manufacturing; and it has never been suggested that the appropriation and diversion of water for these purposes, though destructive of fisheries, require condemnation proceedings before they can be exercised. If the state may use public waters to establish public fisheries, upon the theory that such use is a beneficial one, then the State's plenary power over public water is its authority therefor. The legislature has made ample provision for the public use of public waters for fishing, by Ch. 43, N.M.Sts. 1941, a comprehensive law authorizing the State Game Commission, (among other things) "to establish and * * * operate fish hatcheries for the purpose of stocking public waters of the state * * *"; all for the use and benefit of the public, to be enjoyed under the protection of state laws.

But upon what theory can the appellee object to the use of public water by the authorized public? It has not now, nor has it ever had, any right, title or interest in these waters. No water, water right, or the use of water, was conveyed to it by the United States. The water was reserved for the use of the public. California Oregon Power Co. v. Beaver Portland Cement Co., supra. Appellee has no more right to the use of the unappropriated water on the land grant than has any other person, except as the law against trespassing on private property favors it. The public waters of this state, by legislative authority, have been dedicated to the use of the public for fishing and recreation, and the Conchas lake is not an exception. We do not find that we erred in so holding.

The appellee asserts that "the majority opinion on the motion for rehearing misinterprets the finding of the district court as to the making of the Pablo Montoya Grant."

We may assume for the purposes of this case that appellee was entitled to show the lack of jurisdiction in the Mexican authorities to make the original grant, as it contends. But the United States conveyed no water, water right, or the right to use water, to its predecessor in title; and it is entirely immaterial whether the Mexican title was invalid.

Another question posed was fully considered and decided in our opinion on the first motion for rehearing, and we adhere to the views therein stated.

Amici Curiae have filed a brief in opposition to the claims of the state. The

questions submitted therein were either not presented below or have been fully answered in one or more of the majority opinions. We adhere to our original views, particularly those stated in our opinion on rehearing. Such being the case, the second motion for rehearing will stand denied by operation of law. Flaska v. State, 51 N. M. 13, 177 P.2d 174.

SADLER, Justice (dissenting).

The decision of this court on second motion for rehearing in the case of Flaska v. State, 51 N.M. 13, 177 P.2d 174, has rendered futile further consideration or discussion of the issues on this appeal. Neither the late Chief Justice BICKLEY nor myself, both having disagreed with the majority opinion herein, participated in the decision mentioned in the Flaska case, having recused ourselves. Nevertheless, both entertained the view that, regardless of the merits of the doctrine there announced, it should be without application to pending cases because of a contrary practice long prevailing in this state as demonstrated by the decisions of this court on rehearing in the cases of State v. Armstrong, 31 N.M. 220, 243 P. 333; Odell v. Colmor Irrigation & Land Co., 34 N.M. 277, 280 P. 398 and State v. Pate, 47 N.M. 182, 138 P.2d 1006, in each of which a judge or judges participated on rehearing as successor to some judge no longer on the court who had participated in rendering the original decision.

The foregoing remarks may seem superfluous in as much as the rule laid down in the Flaska case now has become the law of this state. Chief Justice BRICE, Mr. Justice LUJAN and myself as the only members of the court still remaining such who participated in the original opinion, thus alone are entitled to participate in disposing of appellee's second motion for rehearing. What has been said by me in previous opinions filed in this case, properly classifies me as in favor of granting the motion, a result I am as helpless to accomplish as are my participating brethren to give more than minority expression to the views advanced in the annexed opinion prepared by the CHIEF JUSTICE and subscribed by Mr. Justice LUJAN. Since under the Flaska decision the motion must stand denied by operation of law, it would avail nothing for two opposing minorities on the court to debate the merits of their respective views. Suffice it to say that such an unsatisfactory ending to a case involving issues so important is to be deplored.